EL PUEBLO DE PUERTO RICO, apelado, *v.* ALVIN PÉREZ RIVERA, WILFREDO ACEVEDO CURBELO, MARIANO RIVERA NIEVES, JOSÉ PÉREZ PÉREZ y CESÁREO FELICIANO PÉREZ, acusados y apelantes.

*Número:* CR-79-50      *Resuelto:* 28 de noviembre de 1980

*Héctor Lugo Bougal,* abogado de los apelantes; *Héctor A. Colón Cruz, Procurador General, y Miguel A. Santana Bagur, Procurador General Auxiliar,* abogados de El Pueblo.

SENTENCIA

Los apelantes fueron acusados de sabotaje de servicios públicos esenciales (Art. 182 del Código Penal) e infracciones de los Arts. 6 y 8 de la Ley de Armas. Cuatro de los acusados fueron convictos por jurado, por tentativa de sabotaje de servicios públicos esenciales; tres fueron convictos por tribunal de derecho por infracción del Art. 6 de la Ley de Armas. No progresaron las acusaciones por infracción del Art. 8 de la Ley de Armas, resultando absueltos los imputados. El juez

sentenciador dispuso penalidades de 2 a 3 años de prisión por las convicciones de sabotaje y de seis meses en los casos del Art. 6 de la Ley de Armas. Las sentencias se cumplirían concurrentemente. El juez concedió los beneficios de sentencia suspendida en todos los delitos.

Los apelantes sostienen que la prueba de cargo es insuficiente y que los veredictos son contrarios a derecho; sostienen, además, que erró el tribunal al admitir prueba de referencia inadmisible. La defensa no ofreció prueba alguna de defensa, aunque había anunciado la defensa de coartada. Los acusados ejercieron su derecho a no declarar. La defensa renunció a los testigos que había anunciado. Ante tal cuadro, la suficiencia de la prueba se limita a una cuestión de credibilidad. La prueba de cargo, de ser creída por el juzgador —como lo fue—, es suficiente para establecer los elementos de los delitos. En cuanto al señalamiento de prueba de referencia, aparte de que es cuestionable si se trataba de prueba de referencia propiamente dicho, (¹) ciertamente no se cometió error perjudicial que amerite revocación. Aun excluyendo la evidencia impugnada, hay prueba suficiente para sostener las sentencias apeladas. Por último, es inmeritorio el señalamiento de veredictos contradictorios. La duda razonable con relación a las violaciones del Art. 8 de la Ley de Armas no implica de suyo duda razonable con relación a la tentativa de sabotaje. Además, como se sabe, los jurados no tienen que emitir veredictos, al considerar varios cargos, con el rigor de la más absoluta consistencia lógica.

Se confirman las sentencias apeladas.

Así lo pronunció y manda el Tribunal y lo certifica el señor Secretario. El Juez Asociado Señor Rigau emitió opinión concurrente a la cual se unió el Juez Asociado Señor Díaz Cruz. El Juez Asociado Señor Irizarry Yunqué no intervino.

(Fdo.) Ernesto L. Chiesa

*Secretario General*

---

(¹) Véase página 398, opinión del Juez Asociado Señor Rigau.

—O—

Opinión concurrente del Juez Asociado Señor Rigau a la cual se une el Juez Asociado Señor Díaz Cruz.

San Juan, Puerto Rico, a 28 de noviembre de 1980

Este caso es un ejemplo de que las huelgas deben mantenerse dentro de los límites que la ley y la necesidad social les imponen. Esto es, que deben ser pacíficas y las partes no deben recurrir al sabotaje y a la violencia.

Con demasiada frecuencia ocurre en este país que cuando se produce una huelga contra una agencia de un servicio público esencial o importante, se recurre al sabotaje, actos estos por los cuales sufre el pueblo en general. Sufre en sus hogares, sus hospitales, sus escuelas, sus oficinas públicas, sus fábricas, sus establecimientos comerciales, y sufre su salud y su tranquilidad.

En el caso de autos, el sabotaje, con motivo de un estado huelgario, fue dirigido contra la Autoridad de las Fuentes Fluviales (ahora Autoridad de Energía Eléctrica), agencia pública que tiene la función monopolística de proveer de fuerza y luz eléctrica a los cuatro millones de habitantes de Puerto Rico.

El caso envuelve a 5 apelantes. A la fecha de los hechos, 2 de enero de 1978, 4 de ellos eran empleados de la Autoridad de las Fuentes Fluviales y el quinto era hijo de uno de ellos. Cuatro de los apelantes (José Pérez Pérez, Mariano Rivera Nieves, Alvin Pérez Rivera y Cesáreo Feliciano Pérez) fueron convictos por jurado, de tentativa de sabotaje de servicios públicos esenciales. Mariano Rivera, Wilfredo Acevedo y Alvin Pérez fueron convictos por tribunal de derecho, de violación del Art. 6 de la Ley de Armas. Por violación del Art. 8 de dicha Ley fueron absueltos Mariano Rivera y Wilfredo Acevedo.

El Magistrado sentenciador dispuso penalidades de 2 a 3 años de prisión en los delitos de tentativa de sabotaje y de 6

meses de cárcel en los de violación del Art. 6 de la Ley de Armas. Dichas sentencias se servirían concurrentemente y el tribunal concedió el beneficio de sentencia suspendida en todos los delitos.

El Código Penal, en su Art. 182 (33 L.P.R.A. sec. 4288) define el delito de sabotaje de servicios públicos en la siguiente forma:

Será sancionada con pena de reclusión por un término mínimo de un año y máximo de diez años toda persona que, con el propósito de impedir parcial o totalmente la prestación de los servicios públicos esenciales, destruyere, dañare o alterare en alguna forma el funcionamiento de las instalaciones o equipos de servicio de agua, gas, electricidad, teléfono, telégrafo o cualquier otra propiedad destinada al servicio público, incluyendo el de transportación y comunicación.

Los apelantes hacen 3 planteamientos, los cuales consisten en lo siguiente: (1) insuficiencia de la prueba, (2) admisión de prueba de referencia y (3) veredicto contrario a derecho. Ninguno de dichos señalamientos justifica revocar las sentencias.

La prueba de cargo, incontrovertida y creída por los jueces de los hechos, establece suficientemente los delitos imputados a los apelantes convictos. La defensa no ofreció prueba alguna, a pesar de haber anunciado la de coartada, a la cual renunció. Los acusados ejercieron su derecho a no declarar. La defensa también renunció a unos testigos que había anunciado.

De la prueba surge lo siguiente. El 2 de enero de 1978, Felipe Pérez, quien trabajaba en el Hospital de Distrito de Arecibo, se encontraba en la casa de su primo, José Pérez Pérez, uno de los apelantes. Allí también estaban los apelantes Alvin Pérez Rivera, Mariano Rivera Nieves y Cesáreo Feliciano Pérez. Al llegar Felipe, Mariano expresó que ese era el hombre que necesitaban. Le dieron $10 para gasolina y le prometieron $75 adicionales por llevarlos a San Sebastián

para ejecutar "un acto" a favor de los obreros de la Autoridad de las Fuentes Fluviales.

En el baúl del carro de Felipe echaron cuatro pares de guantes, una segueta, una llave ajustable, una tijera de tres pies de largo y dos sierras de mano. Felipe, José, Mariano y Cesáreo partieron hacia San Sebastián. En la carretera cambiaron de parecer y desistieron de realizar el acto que se habían propuesto, pero, en el camino de regreso, Mariano le ofreció a Felipe $200 por cortar un poste de la Autoridad, que le señaló en el Cerro del Mono, a un lado de la Carretera Estatal Núm. 2. Felipe aceptó. Regresaron a casa de José. Luego Felipe acompañó a Mariano a su casa para recoger los $200 y para recibir instrucciones sobre cómo cortar el poste, de manera que cayera sobre la carretera.

Regresaron a casa de José, sacaron las herramientas del baúl del carro de Felipe y las pasaron al carro de Alvin. José le dio a Felipe una chaqueta para que se la pusiera y se quitara su camisa militar con insignias, porque era muy llamativa. Felipe, Mariano y Alvin fueron en el carro de éste hasta un lugar cercano al poste, y Mariano indicó a Felipe la ruta que debía seguir a pie para llegar hasta el poste. También le entregó un revólver para que se protegiese si lo descubrían.

Felipe se llevó las sierras, las tijeras y un par de guantes. Llegó al poste y comenzó a cortarlo. Pero, al notar que un carro de la Policía se había estacionado cerca de un negocio cercano llamado "La Casa Agrícola", se atemorizó y se retiró del lugar. Dejó una sierra incrustada en el poste que estaba cortando y se llevó el resto de las herramientas.

Al bajar a la carretera, se deshizo de las tijeras, de la sierra y de los guantes, botando dicho equipo en un cañaveral. Luego caminó y regresó a la casa de José. Su carro ya no estaba allí, porque se lo habían llevado hasta la casa de Mariano. Felipe recobró el carro y regresó a su casa entre las 11:30 y 12:00 de la noche.

Al llegar a su casa, Felipe llevaba la chaqueta que José le había dado, enrollada alrededor del revólver para ocultarlo. Su madre le preguntó qué traía ahí y él al principio contestó con evasivas, pero, ante la insistencia de ella, le relató que Mariano le había entregado el revólver y $200 para que tumbara un poste. Luego Felipe le sacó las balas al revólver y le entregó el arma, las balas y los $200 a su madre para que los guardara hasta el día siguiente para devolverlos a Mariano. Felipe también le relató a su esposa lo que había ocurrido. Al salir de la casa, Felipe se encontró con Mariano, acompañado del apelante Wilfredo Acevedo, y le devolvió a Mariano el revólver, las balas y el dinero.

Dos días después, Mariano volvió a ver a Felipe y le expresó que había más dinero para tumbar más postes. El 11 de enero, Felipe, sintiendo el repudio de su conciencia, relató los hechos al policía Zenén Segarra. Éste lo conectó con agentes del Negociado de Investigaciones Criminales de la Policía de Puerto Rico.

María Padín, madre de Felipe, declaró sobre lo que ocurrió entre ella y su hijo, incluso la manifestación de Felipe al efecto de que Mariano le había entregado el revólver y los $200 para tumbar un poste. También declaró María que vio a Felipe entregar a Mariano las balas, el revólver y el dinero. Milka Caraballo, esposa de Felipe, declaró sobre los mismos extremos cubiertos por María.

Félix Zanot declaró que el 10 de enero, mientras desyerbaba la finca de su patrono Laureano Borges, encontró los guantes, las tijeras y la sierra y se las mostró a su patrono. Borges declaró corroborando esos hechos y declaró que envió a su hijo Ramón a notificar el hallazgo a la Policía. Ramón declaró que así lo hizo en efecto. El Teniente de la Policía Felipe Soto declaró que tomó posesión de los objetos mencionados, y el Ingeniero Héctor Lebrón, de la Autoridad de las Fuentes Fluviales, declaró que el 14 de enero fue llamado por la Policía para inspeccionar el poste y que así lo hizo.

La prueba que dejamos relatada es abundante y, por lo tanto, carece de mérito el primer señalamiento de error.

En cuanto al segundo señalamiento, sobre admisión de prueba de referencia, se relaciona con los testimonios de la madre y de la esposa de Felipe.

Concurrimos con la posición del Procurador General, en el sentido de que esa prueba no se presentó para probar el contenido de la manifestación hecha, esto es, que Mariano le dio los $200 y el revólver a Felipe, sino para probar que Felipe, en efecto, había hecho dicha manifestación. Como se sabe, una manifestación constituye prueba de referencia, si se presenta con el propósito de establecer que su contenido es cierto, pero no la constituye, cuando se presenta para probar que la manifestación en efecto se hizo. *Pueblo* v. *Rivera Burgos*, 106 D.P.R. 528 (1977).

En la situación de autos, Felipe declaró que Mariano le dio el revólver y el dinero para que cortara el poste y que él manifestó ese hecho ante otras personas. Es claro que Felipe podía declarar sobre esos extremos que le constaban personalmente. Los testimonios de su madre y de su esposa meramente corroboran que Felipe hizo esa manifestación.

Tampoco tienen razón los apelantes al sostener que esa prueba no debió admitirse por constituir una declaración extrajudicial de un coacusado, que incrimina a otro acusado. Felipe no fue un coacusado, sino testigo de cargo.

También carece de mérito el tercer señalamiento al efecto de que el veredicto es contrario a derecho. Se apoya en las dos absoluciones a las violaciones al Art. 8 de la Ley de Armas. Como se sabe, cuando hay varios cargos, los veredictos del jurado no tienen que ser absoluta y perfectamente consistentes entre sí. *Pueblo* v. *Medina Ocasio*, 98 D.P.R. 302 (1970); *Pueblo* v. *Feliciano Rivera*, 99 D.P.R. 589 (1971); *Pueblo* v. *Cortés Calero*, 99 D.P.R. 679 (1971); *Pueblo* v. *Figueroa Castro*, 102 D.P.R. 279 (1974) y *Pueblo* v. *Cruz Negrón*, 104 D.P.R. 881 (1976).

Entendemos que, tratándose de sabotaje contra un servicio público tan esencial como lo es la energía eléctrica, la ilustrada sala sentenciadora fue innecesariamente leniente al suspender las sentencias en todos los delitos. Ya hemos señalado que estos delitos de sabotaje que se cometen contra los servicios públicos importantes, no se cometen contra un individuo o una empresa en particular, sino contra todo el pueblo. En estos casos, la indebida lenidad estimula, en vez de disuadir su comisión.

En vista de lo anterior, deben confirmarse las sentencias apeladas.