EL PUEBLO DE PUERTO RICO, apelado, *v.* SAMUEL ADORNO CA-
BRERA, CÁNDIDO ADORNO CABRERA, RUBERO ADORNO CABRERA
y CARMELO DEL MORAL AVILÉS, acusados y apelantes.

*Números:* CR-83-64    *Resueltos:* 30 de junio de 1993
CR-83-79

*Raúl Barrera Morales, Procurador General Interino, y Josefa A. Román García, Procuradora General Auxiliar*, abogados de El Pueblo; *Elías González Mathews y Rafael Fuentes Rivera*, abogados de los apelantes.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

¿En qué circunstancias una declaración extrajudicial anterior del testigo principal de cargo (coautor), esencialmente inconsistente con el testimonio prestado ante el tribunal y admitido con efecto sustantivo, es suficiente para sostener la culpabilidad? Contestar esta interrogante exige una meticulosa exposición del trasfondo procesal y fáctico pertinente.

I

Los hermanos Samuel (c/p Sammy), Cándido y Rubero, de apellidos Adorno Cabrera, y Carmelo Del Moral Avilés

(c/p Guillo) fueron acusados de asesinar el 7 de octubre de 1981, en concierto y común acuerdo, a José Miguel Orsini (c/p Cheo) y a Ángel Manuel Bruno Ramos (c/p Pocholo); de tentativa de asesinato contra Ángel M. Bruno Ramos, y de varias infracciones a la Ley de Armas de Puerto Rico.

El Jurado rindió veredictos de culpabilidad en los delitos graves y el juez en los delitos menos graves. Apelaron.(¹)

Conforme a la Exposición Narrativa de la Prueba y demás evidencia,(²) el 22 de marzo de 1982 el testigo princi-

---

(¹) La prueba del Ministerio Fiscal consistió de dos (2) declaraciones juradas prestadas por José Ricardo Ramírez Seijo (c/p Ricky), coautor, las cuales fueron admitidas como declaraciones anteriores cuando dicho testigo varió en corte abierta su testimonio. Además, se presentaron los testimonios de la patóloga, Dra. Yocasta Brugal; de la viuda de Bruno Ramos, Evelyn Miranda; del Fiscal investigador, Lcdo. Juan López Morales; de la viuda de Ríos Orsini, Antonia Pérez Santana; del agente Luis A. Maysonet; del ganadero Isaac Pérez Rosado; del agente del C.I.C. Heriberto Méndez De Jesús; del Comandante de la Policía Edelmiro Rivera Falcón, y del Lcdo. Emilio Hidalgo Nazario, abogado del testigo Ricky en otros procesos judiciales pendientes.

La defensa no presentó ningún testigo.

Se admitieron como evidencia, con la objeción de la defensa, las dos (2) declaraciones aludidas; tres (3) plomos y dos (2) diagramas (*charts*) preparados por la patóloga doctora Brugal, demostrativos de la localización de las perforaciones de bala en los cuerpos de los occisos; fotos de la finca y de una fosa donde fueron hallados y descubiertos los cadáveres; de los vehículos que allí se encontraron y de los alrededores del lugar; una citación para un caso por alegada violación al Art. 6 de la Ley de Armas de Puerto Rico, 25 L.P.R.A. sec. 416, cuyo epígrafe leía *El Pueblo de Puerto Rico v. Samuel Adorno Cabrera*, hallada por la Policía en uno de los vehículos que estaban en el lugar de la excavación de la fosa; y las ediciones del periódico *El Vocero de Puerto Rico* correspondientes al lunes 22 y al miércoles 24 de marzo de 1982, que reseñaban noticias relacionadas con la investigación del caso.

La defensa presentó unas copias certificadas de las sentencias por tentativa de apropiación ilegal y homicidio dictadas contra Ricky. El tribunal sentenciador no admitió una grabación alegadamente hecha por Ricky, en fecha posterior a los hechos, donde exculpa a los apelantes e incrimina a otras personas. Adelantamos que durante su testimonio en el juicio, el confeso coautor Ricky declaró conforme la versión contenida en la grabación referida.

(²) El Jurado encontró culpable a Adorno Cabrera (Sammy) por el delito de asesinato en primer grado y por dos (2) infracciones al Art. 8 y dos (2) al Art. 6 de la Ley de Armas de Puerto Rico, 25 L.P.R.A. secs. 418 y 416. Por tribunal de derecho fue declarado culpable del Art. 6 de la Ley de Armas de Puerto Rico, *supra*.

Se rindió un veredicto igual contra Adorno Cabrera (Rubero) por infracciones a los Arts. 8 y 6 de la Ley de Armas de Puerto Rico, *supra*. El mismo juez le encontró culpable por el Art. 6 de la Ley de Armas de Puerto Rico, *supra*.

En ese proceso, el Jurado también encontró culpable a Del Moral Avilés (Guillo) por infracciones graves a los Arts. 8 y 6 de la Ley de Armas de Puerto Rico, *supra*. El Juez encontró, además, culpable a Cándido Adorno Cabrera (Cándido) por infracción

pal de cargo, Ramírez Seijo (c/p Ricky), prestó su primera declaración jurada ante el Fiscal Juan López. Incriminó a los cuatro (4) apelantes en los asesinatos y las violaciones mencionadas a la Ley de Armas de Puerto Rico. En síntesis, luego de las advertencias de rigor, sostuvo que el 5 de octubre de 1981 había planeado con Sammy matar a José M. Orsini (c/p Cheo), porque Justino Díaz Cabrera (c/p Tinito) le había dado una confidencia a Sammy en el sentido de que Cheo planeaba matarlos a ambos el 6 de octubre de 1981. Según Sammy, el plan de Cheo era pedirle al testigo que hurtara un vehículo,([3]) y cuando fuera a entregarlo junto con Sammy al sector Las Piñas, del Bo. Almirante de Vega Baja, Cheo y Tinito los estarían esperando para ultimarlos.

Para corroborar la confidencia, Ricky fue al otro día (6 de octubre) al taller de Cheo para ver si éste le solicitaba algún automóvil. Efectivamente, Cheo le dijo que necesitaba dos (2) carros hurtados para su cuñado y le pidió que cuando los consiguiera los llevara al sector Las Piñas del Bo. Almirante de Vega Baja después de la una de la tarde (1:00 P.M.). Además de Ricky y Cheo, en el taller se encontraba Bruno Ramos (c/p Pocholo).

Luego de esa conversación, el testigo pensó que lo dicho

---

al Art. 6 de la Ley de Armas de Puerto Rico, *supra*, en su modalidad menos grave.

Sammy fue sentenciado a noventa y nueve (99) años por el asesinato en primer grado; diez (10) años por cada infracción al Art. 8 de la Ley de Armas de Puerto Rico, *supra*, concurrentes entre sí y con la de asesinato en primer grado; tres (3) años de reclusión en cada cargo por violación al Art. 6 de la Ley de Armas de Puerto Rico, *supra* (en su modalidad grave), concurrentes entre sí y con las demás, y dos (2) años de reclusión por la violación al Art. 6 de la Ley de Armas de Puerto Rico, *supra*, en su modalidad menos grave, concurrentes con todas las demás.

A Rubero se le sentenció a cumplir diez (10) años por la infracción al Art. 8 de la Ley de Armas de Puerto Rico, *supra*; cuatro (4) por infracción al Art. 6 de la Ley de Armas de Puerto Rico, *supra*, y un (1) año por infracción al Art. 6 de la Ley de Armas de Puerto Rico, *supra*, en su modalidad menos grave.

A Grillo se le sentenció a diez (10) años de presidio por la violación al Art. 8 de la Ley de Armas de Puerto Rico, *supra*, y cuatro (4) años por la infracción al Art. 6 de la Ley de Armas de Puerto Rico, *supra*, en su modalidad grave.

Por su parte, Cándido fue sentenciado a cumplir un (1) año por la infracción al Art. 6 de la Ley de Armas de Puerto Rico, *supra*, en su modalidad menos grave.

([3]) Cheo tenía un taller de hojalatería y pintura donde alegadamente utilizaba las piezas de los carros hurtados. Ricky se encargaba de apropiárselos ilegalmente.

por Sammy respecto al plan era cierto. Envió a su cuñado a avisar a Sammy para poner en función su plan de contra-ataque, adelantándose y matando a Cheo. El testigo debía actuar conforme al plan de Cheo, pero con la variante de que cuando Cheo fuera a recoger los vehículos hurtados en el sector Las Piñas, se llevaría la sorpresa de que Sammy y sus hermanos Rubero y Cándido, así como el coapelante Carmelo Del Moral, lo estarían esperando.

Para seguir el alegado plan de Cheo —que a su vez era parte del plan de contraataque de Sammy— Ricky le pidió a Pocholo que lo llevara a hurtar los vehículos. Pocholo le dijo que no podía, porque tenía que terminar cierto trabajo. El testigo entonces se lo pidió a su cuñado. El cuñado de Ricky lo llevó a Plaza Carolina y allí se apropió ilegalmente de un Corolla, uno punto ocho (1.8).[4] Regresó con dicho auto al taller de Cheo para informarle que tenía uno (1) de los que había pedido, y envió a su cuñado a informarle a Sammy que lo esperara en el sector Las Piñas, según acordado.

Luego de hablar con Cheo en su taller, le dijo que iría allí para entregarle el carro. Arribó al sector Las Piñas como de dos (2:00) a dos y media de la tarde (2:30 P.M.) para esperar a Cheo. A los quince (15) minutos llegaron al lugar Sammy, Rubero y Cándido en una guagua Ford, color rojo. La ocultaron y se escondieron entre unos árboles. Ese 6 de octubre, Cándido y Rubero tenían una escopeta cada uno y Samuel una (1) pistola.

Esperaron a Cheo infructuosamente hasta las seis (6:00) o siete de la noche (7:00 P.M.) Decidieron entonces irse a sus respectivas residencias. Sammy se encargaría de vender el auto robado. Sammy y Ricky decidieron esperar que Cheo ocupara a este último en otro "trabajito", para llevar a cabo su plan.

Al otro día, el 7 de octubre, Ricky fue por la mañana al

---

[4] Según el testigo, Cheo le pidió un (1) Corolla uno punto ocho (1.8) y un (1) Datsun de 1980.

garage de Cheo "porque quería saber por qué no había ido" a la cita la tarde anterior. Cheo le dijo que no había podido reunir el dinero para pagarle, pero que interesaba que esa noche le consiguiera un (1) Datsun. Ricky le replicó que no tenía quién lo llevara a apropiárselo, y Cheo le dijo que regresara para llevarlo por la noche.

Así lo hizo. A eso de las siete de la noche (7:00 P.M.), regresó al taller y junto a Cheo salió hacia Isla Verde. Al llegar a esa área, cerca de los hoteles, vieron un Datsun color amarillo y Ricky se lo apropió. De regreso a Vega Alta, Cheo le informó a Ricky que él iba a la casa de su cuñado Crespo y que lo fuera a buscar más tarde a su casa en Vega Alta para disponer del auto.

Tras varias incidencias —se destaca que Ricky pasó a casa de Pocholo al no encontrar a Cheo en su casa y que el Datsun amarillo robado se quedó sin gasolina— Ricky y Pocholo fueron a casa de Cheo donde se encontraron con éste y su cuñado Crespo. De allí fueron a abastecer de gasolina al Datsun Amarillo, para luego partir los cuatro (4) al Bo. Espinosa de Vega Baja a dejar el carro robado en un solar de cierta residencia. Después, Ricky, Cheo y Pocholo se dirigieron al sector Las Piñas a buscar la guagua de Ricky. Según Ricky, él instruyó a su cuñado que llevara su guagua a Samuel y le dijera que él estaba buscando un carro con Cheo. De esa manera, Samuel sabía que el plan estaba en marcha y que debía llevar la guagua de Ricky al Bo. Almirante para allí esperar la llegada de Cheo.

En esta primera declaración jurada, así relata Ricky lo ocurrido en el lugar:

Mi guagua estaba estacionada en una entrada del callejón donde yo acostumbraba a estacionarla cuando la dejaba allí. Cuando llegamos los tres allí Pocholo estacionó su vehículo al lado de la guagua mía, tan pronto yo me bajé del vehículo de Pocholo me moví rápidamente hacia la guagua mía y de atrás de mi guagua salió Samuel rápidamente antes de que Cheo pudiera salir del asiento trasero para moverse hacia el asiento delantero, ahí mismo pude ver que Samuel se fue por el lado derecho del auto de Pocholo por la misma puerta donde yo me

había bajado un revólver en sus manos avanzó hacia donde Cheo haciéndole varios disparos y ahí mismo oí que Cheo decía "yo no te he traicionado" y esto lo dijo en dos ocasiones bien duro y luego en esos momentos Pocholo se había bajado de su vehículo diciendo "que pasa, que pasa", a la vez que tiraba un bolso negro al piso y en esos momentos Rubertito, quien se encontraba al lado izquierdo del vehículo de Pocholo con un revólver abrió fuego contra Pocholo haciéndole dos disparos, los cuales no lo hirieron, ahí mismo yo me le tiré encima a Pocholo para protegerlo porque el acuerdo no era matar a Pocholo y en esos momentos se acercó Cayín con una escopeta larga en sus manos encañonó a Pocholo y se lo llevó a la guagua de ellos y en esos momentos todo quedó en calma y cuando nos pegamos hacia la guagua de ellos noté el vehículo de Pocholo vuelve y prende y al mirar pude ver que Cheo estaba sentado frente al guía y tenía el carro prendido y ahí mismo Samuel le pidió el revólver a su hermano Ruberito y se pasó hacia el lado derecho del carro y abrió fuego nuevamente contra Cheo haciéndole varios disparos y ahí noté que el carro se quedó acelerado y Cheo no se movió más, entonces yo me acerque y apagué el carro. En esos momentos Samuel me dijo llevate el carro que yo te llevo la guagua tuya, yo empuje a Cheo para el lado y cuando fue a mover el carro noté que tenía la goma trasera izquierda vacía, la cual procedimos a montar entre Samuel y yo rápidamente. Tan pronto se montó la goma Samuel me dio instrucciones para que llevara el carro de Pocholo hacia la finca Pámpano de Vega Alta. Yo salí primero en el carro de Pocholo con Cheo, quien se encontraba tirado al lado de la puerta derecha y detrás de mi, me seguía Samuel en mi guagua Champ y Cayín y Ruberito montaron a Pocholo en la guagua de doble Cabina, y seguí directamente hacía la finca Pámpano y cuando llegué allí me encontré con El Grillo, quien me dijo que si ya había llegado la 350, no entablé conversación con él de ninguna clase, y como a los veinticinco minutos más tarde de yo haber llegado, llegó Samuel con Cayín guiando la guagua, Ruberito y Pocholo, quienes se bajaron y llevaron a Pocholo hacia la casa y lo hicieron sentarse en una escalera a la vez que el Grillo lo tenía encañonado con un revólver. Cuando ellos llegaron en la guagua Pick-up de Cayín o de ellos, le pregunté que dónde me había dejado mi guagua, entonces Samuel me dijo que estaba en el portón afuera, le dij[e] que por qué la había dejado allá y el me dij[e] que lo habían echo para que no notar[a]n que entraban muchos carros. Mientras tienen encañonado a Pocholo, le pregunté a Samuel que si le iba a dar la oportunidad a Pocholo para que se fuera conmigo, entonces Samuel me llamó aparte y me dijo que no se podía dejar testigos porque todos est[á]bamos

comprometidos en esos y que además ellos eran compadre y que si lo dejaban vivir él iba hablar, entonces yo le dije que no me iba a ir, entonces Samuel me dijo que le ayudara a sacar el cuerpo de Cheo del carro, entonces lo sacamos entre Samuel y yo, cada uno lo agarró por una pierna y lo arrastramos hasta cerca de un bañito que hay de cemento, luego de eso Samuel me dijo que me podía ir y que él se iba a encargar de buscarme a m[í] y que no volviera más hasta Vega Alta hasta que él me fuera a ver. Salí caminando hacia donde estaba mí guagua y cuando estaba llegando a la c[u]rva oí una detonación fuerte.

Después de salir de la finca, Ricky se dirigió a la casa de su suegra en las Parcelitas Carmelita, Vega Baja, y de ahí a la suya en Fajardo.

Como a las dos (2) semanas de estar en Fajardo, Ricky leyó en el periódico *El Vocero de Puerto Rico* un reportaje acerca de la desaparición de Cheo y Pocholo, donde se alegaba que habían sido asesinados y lo señalaban como presunto autor de los hechos. Ante esa noticia se comunicó con Sammy, y éste lo visitó en Fajardo y le dio dinero para que saliera de Puerto Rico. Se fue a Nueva York. Mientras estaba allá, Sammy fue y le entregó tres mil ($3,000) dólares para que no volviera. Sin embargo, en febrero de 1982 Ricky regresó y fue arrestado el 19 de marzo.

Cuando el Fiscal Juan López Morales le pidió a Ricky en esa declaración que describiera las armas usadas el día de los hechos —en manos de los hermanos Cabrera y Grillo (Carmelo Del Moral)— con las que asesinaron a Cheo en su presencia, éste contestó que Sammy tenía un (1) revólver color negro; Rubero uno (1) cromado y Cándido una (1) escopeta larga. El "Grillo" tenía un (1) revólver pequeño de color negro con cachas blancas.

A preguntas del Fiscal sobre los motivos que tendría Cheo para querer matar a Sammy, respondió:

R. En cuanto a Samuel eran problemas de faldas y de dinero y en cuanto a m[í] por dinero.
P. Cu[a]ndo usted dice refiriéndose en cuanto a Samuel dice problemas de falda, sabe usted qu[é] mujer era la que estaba envuelta entre ellos?

R.   La segunda mujer de Samuel, y problemas de dinero.

P.   Qué usted quiere decir problemas de dinero?

R.   Sr. hasta donde yo sé Cheo se alquilaba por contratos para matar gente y a m[í] me había dicho Samuel que Cheo y Justino tenían un contrato para matar a Samuel y matarme a m[í].

P.   Qué usted quiere decir que tenían un contrato para matarlos a ustedes?

R.   Que él había sido contratado por dinero para matarnos a nosotros dos.

P.   Qu[e] usted sepa quién había alquilado a Cheo y a Justino para matarlos a usted?

R.   Juan Claudio Pagán c/p Juan Bouche.

P.   Qu[e] sepa usted había matado alguna persona Cheo por contrato?

R.   Yo personalmente no tuve conocimiento de ningún caso, sino no que esos comentarios me los hacía él.

P.   El día 7 de octubre de 1981, usted salió con Cheo en el carro de Cheo a Isla Verde a guisarse un carro, desde que salieron de Vega Alta hasta que llegaron a Isla Verde durante todo el camino acerca de qué hablaron?

R.   Bueno la conversación era de que él estaba deseoso que a Samuel lo mataran para él quedarse con la segunda mujer de él.

P.   Le pregunto, si Cheo le dijo durante el viaje si sabía de algui[e]n que quería o iba a matar a Samuel?

R.   Ese día la conversación era de que él estaba deseoso que liquidaran a Samuel para quedárselo con la mujer y hablaba palabras obscenas de Samuel. Otro día mientras yo me encontraba en el taller de Pocholo y Cheo llegó Justino y tuvo una conversación con Cheo, la cual yo no oí, pero Cheo luego de terminar de hablar con Justino vino donde m[í] y me dijo que había echado la suerte de quién era el que iba a matar a Samuel y que a él le había tocado el palito más corto haciendo el comentario de que hasta por mil peso[s] acompañaba a Justino.

P.   Qué quiere usted decir con el palito más corto?

R.   Que el [que] cogiera el palo más corto era al que le tocaba matarlo.

Finalmente, el testigo concluyó su declaración jurada, describiendo la casa de la finca de los Adorno en el Bo. Pámpanos a donde fueron conducidos Cheo y Pocholo.

Subsiguientemente, *en la vista preliminar, Ricky cambió la versión de los hechos.* Sostuvo que fueron Justino Díaz Cabrera (Tinito), su hermano Randall y otro señor

trigueño, que no conocía, quienes emboscaron a Cheo, Pocholo y a él, y asesinaron a los primeros. De este modo exoneraba a los acusados de toda culpa. Según esta nueva versión, Tinito mató a Cheo porque creía que éste lo iba a asesinar y se le adelantó; que ello ocurrió mientras se disponían a desmantelar el carro Datsun amarillo que el testigo había robado, y que luego de matar a Cheo y a Pocholo, y el testigo haber huido del lugar con una mano herida y haberse ocultado, vio a los asesinos hacer el hoyo donde encontraron los cuerpos de Cheo y Pocholo.

De acuerdo con esta nueva versión, los policías lo torturaron para que prestara la declaración jurada, implicando a los acusados en los asesinatos de Cheo y Pocholo. Además, la Policía alegadamente le prometió ayudarlo en unos casos de apropiación ilegal de automóviles y de asesinato pendientes en los tribunales. Luego de un día intenso de torturas, decidió inventarse "la historia de que Samuel y yo habíamos planeado la emboscada a Cheo y Pocholo".

Por último, en su nueva versión, adujo que el fiscal investigador Juan López, en unión a los agentes, lo obligaron a firmar la declaración jurada reseñada anteriormente, y que el abogado que lo representaba en los cargos pendientes ante los tribunales le aconsejó que cooperara. Según él, el Fiscal López Morales le dijo que iba a buscar la manera de que la sentencia fuera corta y concurrente, y que haría las gestiones para que la cumpliera fuera del país.

La grabación hecha alegadamente por Ricky, presentada por la defensa y no admitida durante el juicio, contiene una segunda versión de los hechos similar al testimonio vertido por Ricky en la vista preliminar. Esa fue la prestada en el juicio. *Oportunamente, el Ministerio Público presentó y el foro sentenciador admitió como prueba sustantiva la primera declaración jurada prestada.*

Enfatizamos que en el juicio la defensa contrainterrogó extensamente a Ricky sobre el contenido de su primera y segunda declaración jurada, y de la forma y manera en que

éstas fueron obtenidas. Los miembros del Jurado tuvieron una oportunidad amplia de sopesar ambas versiones y el testimonio de Ricky durante el contrainterrogatorio.

También fue admitida en evidencia, como prueba sustantiva, la segunda declaración jurada prestada en corte, el 4 de mayo de 1982, por Ricky mientras se encontraba en la cárcel de Distrito de Humacao. Esta segunda declaración jurada se realizó después de haber celebrado la vista preliminar. En ésta, Ricky explica por qué cambió su primera declaración jurada en su testimonio durante la vista preliminar y sostiene que *la verdad es lo declarado en la primera.* Expresó que el día en que se iba a celebrar la vista preliminar lo encerraron en una celda del tribunal *junto* a los acusados y allí le pidieron que no declarara contra ellos; que si se abstenía le iban a conseguir y pagar un abogado que se encargara de los casos que tenía pendientes; le entregarían una guagua que Sammy tenía y que le pertenecía; que se encargarían que los testigos en su contra en los casos que tenía pendientes en el Tribunal Superior, Sala de Arecibo, no fueran a testificar, y le prometieron que mientras estuviera en la cárcel, no le iba a faltar nada. Adujo, además, que Carmelo Del Moral y Sammy lo amenazaron diciéndole que él "como chota no podía vivir en la cárcel"; además, que "del cambio de su declaración dependía que siguiera viviendo".

Expresó también que su esposa lo visitó en la cárcel y le llevó una carta de parte de los Adorno en la cual le instaban a mantener una actitud de no declarar y que implicara a Tinito en el doble asesinato, "puesto que ya se había grabado una cinta días después de los hechos donde yo (Ricky) decía que Justino Díaz Cabrera [Tinito] era el autor de los hechos". Esa cinta se la envió Ricky a la esposa de Cheo. Según la carta, la grabación era la forma de implicar a Tinito en los asesinatos y ayudar a los acusados.

Por otro lado, reconoció que parte de lo declarado en la vista preliminar se lo inventó y otra parte fue lo que, en la

celda del tribunal, Sammy le dijo que debía declarar. Reconoció, además, que se había inventado la supuesta tortura dada por los policías para que prestara la primera declaración jurada. Se inventó, junto a Sammy, lo de la grabación que le envió a la viuda de Cheo en la que implicaba a Tinito porque Sammy le dijo que Tinito estaba cooperando con la policía para incriminarlo en el doble asesinato.

Durante el juicio testificó, además, la patóloga forense Dra. Yocasta Brugal. Atestó que había realizado las autopsias de los cadáveres de Cheo y Pocholo. Determinó que Cheo murió por laceración y perforación de los órganos internos debido a heridas de bala. Extrajo tres (3) balas de su cadáver, los cuales según su experiencia eran calibre treinta y ocho (38). En cuanto a Pocholo, declaró que no encontró en el cuerpo ningún proyectil, pero que mostraba una muesca (media luna) en la órbita superior izquierda del cráneo, lo que le permitía concluir que la causa de la muerte era compatible con un trauma cráneo cerebral severo debido a herida de bala. En ambos casos, declaró que las heridas fueran producidas por (1) un escopetazo. Los cuerpos estaban en avanzado estado de descomposición.

La viuda de Pocholo atestó, en síntesis, que el día de los hechos, alrededor de las 8:30 de la noche, Ricky llegó a su casa en un carro pequeño amarillo y llamó a Pocholo para que éste lo llevara a buscar gasolina para el auto referido. Pocholo se fue en su auto, con Cheo y Ricky en el auto amarillo. Fue la última vez que lo vió con vida. En el contrainterrogatorio expresó que, como dos (2) o tres (3) días antes de su muerte, Pocholo le había expresado que él y Cheo habían tenido un problema con los hermanos Samuel y Rubero Adorno.

El Fiscal Juan López Morales, quien investigó el caso inicialmente, prestó testimonio y tomó las declaraciones juradas que prestó Ricky. En cuanto a la forma en que tomó la primera declaración, dijo que el 23 de mayo de 1982 fue llamado por la policía para informarle que habían

detenido a una persona con relación al doble asesinato, quien resultó ser Ricky. Al llegar a la Fiscalía de Bayamón, se entrevistó con el abogado de Ricky, para entonces el licenciado Jiménes Reverón, quien le indicó que su representado estaba en la mejor disposición de declarar a cambio de que no ser acusado por los hechos. Luego de hacerle las advertencias de ley, entrevistarse con Ricky y comprobar que su versión corroboraba(5) sus propias observaciones, decidió usarlo como testigo y no acusarlo como coautor. Procedió a tomarle la primera declaración jurada; una vez transcrita, Ricky la leyó, inició todas las páginas y firmó la última.

Le sorprendió ver a Ricky y a los acusados en la misma celda del tribunal el día de la vista y mandó a un alguacil a sacarlo y llevarlo a su oficina. Allí lo entrevistó y Ricky le dijo que no estaba en disposición de declarar contra los acusados.

Después de la vista preliminar, el 3 de mayo de 1982, Ricky lo llamó a través del Alcaide de la Cárcel de Humacao para explicarle por qué había cambiado su declaración en la vista preliminar. Allí, el 4 de mayo, le tomó la segunda declaración jurada.

El Fiscal López Morales atestó que no gestionó órdenes de allanamiento en las residencias de los acusados porque el descubrimiento de los cadáveres fue realizado el 21 de marzo de 1982, y para el 22 y 23 de marzo su investigación y los hallazgos habían sido objeto de amplios reportajes en el periódico *El Vocero de Puerto Rico*. Por lo tanto, entendió que cualquier gestión suya para buscar las armas sería una pérdida de tiempo, pues la prensa claramente había identificado la finca —donde se encontraron los cadáve-

---

(5) El Fiscal López Morales señaló al respecto que tomó la decisión de otorgarle inmunidad a Ricky "porque lo que dicho testigo le dijo corrobora unos cuantos aspectos que [yo] había observado en la Finca Pámpanos de Vega Alta el 21 de marzo de 1982; me habló de la casita alta en zocos, ranchones, letrina, el portón donde se dejó la guagua, el camino lo describió. Todo me era familiar con lo que yo había visto y concluí que el hombre estaba diciendo la verdad".

res— como propiedad de los hermanos Adorno. Con la objeción de la defensa, se admitieron en evidencia los ejemplares del periódico *El Vocero de Puerto Rico* correspondientes a esas fechas.

El tribunal *instruyó ampliamente* al Jurado en cuanto al propósito por el cual se permitieron las preguntas sobre las publicaciones referidas; esto era para demostrar que a base de esa información periodística, el Fiscal López Morales decidió no obtener una orden de allanamiento para ocupar las armas por entender que no sería práctico. El juez les instruyó que ello *no* era prueba de que su contenido fuera cierto o falso. Les recalcó también que la respuesta del testigo no era prueba de la verdad o falsedad del contenido de las noticias, sino sólo del hecho de que el Fiscal conocía esa publicación y esto, junto a otras circunstancias, le había dado el fundamento para entender que no era práctico obtener una orden de allanamiento. Nuevamente les enfatizó que ello no era prueba de que el contenido de la información fuera cierto o falso, y que su admisión no tenía ese propósito.

La viuda de Cheo declaró, en esencia, que el 7 de octubre de 1981 vio llegar a su casa a Pocholo y a Ricky en el carro de Pocholo. Luego de hablar con Cheo, éste llamó a Santos Crespo, despúes le dijo a ella "vengo ya mismo" y se fue con Ricky y Pocholo. Fue la última vez que lo vio vivo. Señaló que Cheo le había dicho que tuvo un problema con Samuel Adorno.

Añadió que, mientras Cheo estaba desaparecido, ella fue a hablar con Sammy para que la ayudara a buscarlo, y él le dijo "que la podía ayudar para siempre económicamente y sin interés ninguno hasta que muriera". Luego le dio cien dólares ($100). Además, señaló que recibió la grabación a la cual Ricky hizo referencia en su testimonio, pero que el "sobre" donde la recibió no tenía remitente. No pudo identificar la voz de la grabación como la de Ricky.

También atestó el agente Luis A. Maysonet. Declaró que el 21 de marzo de 1982 participó en el registro y allanamiento realizado en la finca de los Adorno en el barrio Pámpanos de Vega Alta. Según el testigo, al llegar a la finca había en la entrada un portón de tubos cerrado con cadena y candados. Enviaron cuatro (4) agentes más, picaron los candados y entraron. Una vez cruzaron el portón y se internaron por el camino hacia una casa y unos ranchones, vieron a un individuo —a quien luego identificaron como Sammy— que venía por el mismo camino frente a ellos, sin camisa y montado en un caballo. Al enfrentar el auto en que viajaban los agentes a unos cien (100) metros, el jinete viró su caballo de forma rápida y se dirigió a la casa. Los agentes abandonaron el vehículo y lo siguieron, pero éste se les perdió de vista. Al llegar a la casa, entraron pues la puerta estaba abierta y vieron una estufa encendida, piezas de vehículos y otros enseres de cocina. Al revisar los alrededores, encontraron el caballo ensillado cerca de un rancho y, como a cincuenta (50) pies, una excavación o fosa, palas, picos y un envase de pintura lleno de gasolina. Dentro de la fosa sobresalía la punta de un zapato. Allí encontraron los cadáveres de Cheo y Pocholo.

Cerca de la fosa, enganchada en una mata de plátano, hallaron una camiseta (*t-shirt*). También, próximo a la casa, había una guagua *pick-up* roja con el encendido puesto. Dentro encontraron un sinnúmero de piezas de vehículos, dinero en efectivo, balas de pistola nueve (9) mm, una camiseta crema en el asiento delantero, documentos de un caballo, así como la fotocopia de una denuncia y una citación judicial contra Samuel Adorno por alegada violación al Art. 6 de la Ley de Armas de Puerto Rico, 25 L.P.R.A. sec. 416. Estos documentos fueron admitidos como evidencia sobre la objeción de la defensa. Subsiguientemente, arrestaron a los acusados.

El testigo de cargo José Molina Adorno, cuñado de los coacusados Adorno Cabrera, atestó que en febrero de 1981 había vendido una guagua Ford pick-up a Cándido Adorno Cabrera por mil ochocientos dólares ($1,800) y dos (2) caballos.

El Ministerio Público trajo a declarar al ganadero Isaac Pérez Rosado para que describiera la ubicación del camino de entrada de la finca de los Adorno con relación a la suya.

Testificó, además, el agente del C.I.C. Heriberto Méndez De Jesús, quien atestó que no pudo levantar huellas digitales en el lugar de los hechos o en los objetos ocupados.

El entonces comandante del C.I.C. del Área de Bayamón, Edelmiro Rivera Falcón, atestó que personalmente ingresó a Ricky en la cárcel de Bayamón, luego de arrestarlo con relación a los cargos que tenía pendientes. Una vez Ricky decidió testificar contra los acusados, le pidió que interviniera porque temía que su vida corriera peligro en la cárcel. En sus oficinas del C.I.C. de Bayamón, le entregó parte de la propiedad ocupada durante el allanamiento a Sammy y a Cándido, luego de tramitarse una orden de excarcelamiento. Redactó un recibo, el cual ambos acusados firmaron. Estos recibos fueron admitidos como evidencia. Además, la policía entregó parte de la propiedad ocupada al padre de los hermanos Adorno Cabrera, quien firmó un recibo a esos fines. Este recibo también fue admitido como evidencia.

El último testigo de cargo fue el Lcdo. Emilio Hidalgo Nazario.[6] Declaró haber sido el abogado quien representó a Ricky en los casos pendientes de apropiación ilegal y asesinato. Adujo que la rebaja que obtuvo Ricky en esos casos no fue debido a que iba a declarar en el caso de autos, sino porque la prueba no era contundente para ventilarlos conforme a las acusaciones originales. Le rebajaron a Ricky los ocho (8) cargos de apropiación ilegal agravada,

---

[6] Testigo de defensa que presentó el Ministerio Público después que aquélla lo renunció.

por el cual hizo alegación de culpabilidad y le fue impuesta una pena de dos (2) años de cárcel por cada cargo, concurrentes entre sí. En la acusación de asesinato en primer grado e infracción a los Arts. 6 y 8 de la Ley de Armas de Puerto Rico, *supra*, hizo alegación de culpabilidad por homicidio y le fue impuesta una sentencia de cuatro (4) años, concurrente con los dos (2) años por la tentativa de apropiación ilegal agravada. Para obtener las rebajas en los delitos, no utilizó el argumento en cuanto a que Ricky iba a ser testigo en los cargos contra los acusados.

Con esa prueba testifical y la documental, el Ministerio Público sometió su caso. Como indicáramos, la defensa no presentó ningún testigo.

## II

En buena metodología adjudicativa, hemos ordenado y desarrollado el análisis de los señalamientos de error agrupando los que están relacionados; por ende, hemos prescindido de la secuencia númerica original.

Comenzamos con el *séptimo* y *octavo* señalamiento, dirigidos a impugnar la admisibilidad de los dos (2) ejemplares del periódico *El Vocero de Puerto Rico*. Nos aducen que ello causó un daño irreparable por tratarse de prueba de referencia inadmisible y de escaso valor probatorio. No tienen razón.

De los autos surgen las instrucciones *claras y específicas* que impartió el juez al Jurado, en ocasión de permitir las preguntas al testigo Fiscal López Morales como al admitir los periódicos. Les expresó y recalcó el propósito *limitado* de admitirlos, al enfatizar que no eran prueba de la verdad o falsedad del contenido. *Además, al concluir los informes al Jurado, el juez sentenciador volvió a instruir sobre su limitado alcance.* Se presume que el Jurado sigue las instrucciones, descargando ecuánimemente sus funciones. Los apelantes no han rebatido esa presunción.

■ Por otro lado, hemos sostenido reiteradamente que no puede pensarse que el Jurado tiene una susceptibilidad mayor a la del ser humano· ordinario, que le lleve a olvidar su obligación de rendir un veredicto objetivo, justo e imparcial a base de la prueba, por el solo hecho de· que evalúe evidencia relacionada con la publicidad de un caso ánte su consideración. *Pueblo v. Miranda Santiago*, 130 D.P.R. 507 (1992); *Pueblo v. Hernández Mercado*, 126 D.P.R. 427 (1990); *Pueblo v. Lebrón González*, 113 D.P.R. 81 (1982); *Pueblo v. Maldonado Dipiní*, 96 D.P.R. 897 (1969).

En el *noveno* y *décimo* error se cuestionan la admisibilidad de los recibos firmados por los coacusados, Cándido y Samuel, y su padre. Al respecto, se señalan que tales recibos contenían información perjudicial e incriminatoria, y que las firmas de éstos fueron ilegalmente obtenidas por la policía pues, al momento de firmarlos, los apelantes Samuel y Cándido Adorno no tenían representación legal.

■ En *Pueblo v. Tribunal Superior*, 96 D.P.R. 397, 399 (1968), establecimos que "el criterio rector para determinar la necesidad de asistencia de abogado en las etapas anteriores al juicio es la posibilidad real de que pueda causarse un perjuicio sustancial al acusado. Para ello es necesario escudriñar las circunstancias que rodean la confrontación que ha tenido lugar y los frutos de la misma".

De los autos no surge que la firma de los recibos causara un perjuicio sustancial. No creemos que para la entrega rutinaria de tales objetos —accediendo a un pedido— fuera menester la asistencia de abogado. Con o sin recibo, constituyó un incidente pertinente que el Ministerio Fiscal podía presentar para demostrar que esos objetos y el caballo entregados se utilizaron en la comisión de los delitos.

En el *undécimo* señalamiento objetan que se permitiera al Jurado y al juez pasar juicio sobre las alegadas violaciones a la Ley de Armas de Puerto Rico "sin que dichas armas fueran ocupadas ni fueran descritas por ningún tes-

tigo de cargo". Alegato de los acusados apelantes, págs. 15–16.

Bastaría el señalar que los apelantes en su alegato no discuten este señalamiento y, por ende, se entiende como renunciado. *Pueblo v. Dieppa Beauchamp*, 115 D.P.R. 248 (1984). Además, es norma prevaleciente que la presentación del arma en evidencia no es indispensable; es suficiente que se pruebe mediante otra evidencia clara y convincente. *Pueblo v. Torres Nieves*, 105 D.P.R. 340, 347 (1976); *Pueblo v. Toro Asencio,* 104 D.P.R. 847, 849 (1976). De la primera declaración jurada de Ricky surge que los acusados poseían y portaban unas armas, las cuales fueron descritas claramente.

En el *duodécimo* y *decimotercer* señalamiento argumentan la negativa del foro de instancia a admitir la transcripción de las notas de la defensa de lo declarado por Ricky en la vista preliminar y la grabación que supuestamente éste le envió a la viuda de Cheo.

Según se expuso, el testimonio de Ricky durante el juicio cubrió extensamente el contenido de las notas de la defensa sobre su testimonio en la vista preliminar y la grabación. Resultaba, pues, prueba acumulativa que, aunque pertinente, era excluible por considerarse de escaso valor probatorio. Regla 19(e) de Evidencia, 32 L.P.R.A. Ap. IV.

En el *decimocuarto* señalamiento cuestionan el no haberse dado instrucciones al Jurado durante los recesos del juicio para que no comentaran el caso entre sí ni llegaran a conclusiones hasta el momento de su deliberación.

■ El planteamiento es frívolo. Hemos resuelto que "la omisión de dichas advertencias o su emisión en forma incompleta *no es causa de revocación*, a menos que el acusado hubiere advertido oportunamente, al tribunal del incumplimiento [de] la regla y el tribunal lo hubiere desoído, o se demostrare que tal incumplimiento causó perjuicio al acusado". (Énfasis suplido.) *Pueblo v. Díaz Díaz*, 102 D.P.R.

535, 541 (1974). No surge de los autos que los acusados advirtieran al tribunal de su omisión o que el tribunal los haya desoído. De hecho, el examen de las minutas refleja que éstas se dieron en la mayoría de las ocasiones y, en especial, durante los recesos extensos. No han demostrado perjuicio que amerite la revocación.

En el *decimosexto* señalamiento objetan la admisibilidad de la copia de la denuncia y citación contra Samuel Adorno Cabrera incautada durante el allanamiento a la finca de los Adorno. El error no fue cometido.

Esa evidencia fue admitida después que el agente Maysonet declaró acerca de los objetos que ocupó durante el allanamiento de la finca de los Adorno en el barrio Pámpanos de Vega Alta. El foro sentenciador impartió instrucciones al Jurado, explicando el fin de su admisión y su valor probatorio limitado.

### III

En los *segundo, tercero, cuarto, quinto* y *sexto* señalamientos, se quejan de la admisibilidad, como prueba sustantiva, de las dos (2) declaraciones juradas prestadas por el testigo principal de cargo, Ricky. Argumentan que fue un error admitir como prueba sustantiva las declaraciones juradas prestadas por Ricky ante el Fiscal López Morales, de forma *ex parte*, durante la etapa investigativa del caso. Aducen que es contrario a lo resuelto en *Pueblo v. Ríos Nogueras II*, 114 D.P.R. 256 (1983). Tampoco tienen razón.

Lo declarado por Ricky en la etapa investigativa —en las circunstancias de autos— era admisible como prueba sustantiva por caer dentro de una de las excepciones a la norma general de exclusión de prueba de referencia según dispuesto en la Regla 63 de Evidencia, que expresa:

Es admisible como excepción a la regla de prueba de referencia una declaración anterior de un testigo que está presente en

el juicio o vista y sujeto a ser contrainterrogado en cuanto a la declaración anterior, siempre que dicha declaración fuere admisible de ser hecha por el declarante declarando como testigo. 32 L.P.R.A. Ap. IV.

Esta regla es aplicable cuando el testigo ocupa la silla testifical y está sujeto —como aquí lo fue— a ser ampliamente contrainterrogado en torno a la *declaración anterior. Pueblo v. Esteves Rosado*, 110 D.P.R. 334 (1980). Nos explicamos.

Antes de la aprobación de la Regla 63 de Evidencia, *supra*, la admisibilidad de una declaración anterior de un testigo estaba limitada a los fines de impugnarlo. *Pueblo v. López Reyes*, 109 D.P.R. 379 (1980); *Cintrón v. A. Roig, Sucrs.*, 74 D.P.R. 1028 (1953); *Pueblo v. Marchand Paz*, 53 D.P.R. 671 (1938); *Pueblo v. Pérez*, 43 D.P.R. 590 (1932); *Pueblo v. Lafountaine*, 43 D.P.R. 23 (1932). Al presente, sin embargo, esa doctrina no predomina. F.F. Bein, *Prior Inconsistent Statement: The Hersay Rule 801 d(1)(A) and 803(4)*, 26 U.C.L.A. L. Rev. 967 (1979).

En nuestra jurisdicción, al aprobarse en 1979 la Regla 63 de Evidencia, *supra*, se modificó la doctrina prevaleciente. Así lo adelantamos en *Pueblo v. Esteves Rosado*, supra, al resolver que una declaración anterior extrajudicial podía ser admitida y utilizada como prueba de la verdad de lo aseverado en ella si el testigo presente en el juicio o vista hubiese testificado sobre la declaración anterior y, además, estuviese sujeto a ser contrainterrogado en cuanto a ésta: siempre que dicha declaración fuese admisible de ser hecha por el declarante como testigo. Bajo esas condiciones, la declaración anterior podía ser presentada con propósitos sustantivos. Véase, además, E.L. Chiesa, *Práctica Procesal Puertorriqueña: Evidencia*, San Juan, Pubs. J.T.S., 1985, Vol. I, págs. 312–313. Se trata de una situación en la cual el temor o riesgo de violar el derecho constitucional a la confrontación queda salvaguardado por la disponibilidad del testigo en el juicio, susceptible de ser

contrainterrogado por la defensa en la silla testifical. Además, el juez y el Jurado tienen también la oportunidad de observar cómo el testigo explica bajo juramento cualquier inconsistencia. Esas circunstancias superan al argumento que tradicionalmente se invoca para negar el efecto sustantivo de la declaración extrajudicial anterior, anclado en que la defensa no haya tenido la oportunidad de contrainterrogar al momento en que el testigo ofreció la declaración. Bein, *supra*; 4 *Weinstein's Evidence* Sec. 801(d)[01], pág. 1024 *et seq.* (1988);[7] *Pueblo v. Stevenson Colón*, 113 D.P.R. 634 (1982).

Repetimos, la naturaleza adversativa de nuestro sistema permite al juez o al Jurado observar directamente las expresiones, el comportamiento y las reacciones del testigo. Como juzgadores, están en una posición ideal de adjudicar la verdad o falsedad de la declaración prestada anteriormente; determinar la verdad o falsedad del testimonio del propio testigo ofrecido en el tribunal a la luz de las inconsistencias en ambos, o determinar la falsedad de ambas y no adjudicarle credibilidad a ninguna.

■ Cuando el testigo declara en el tribunal sobre el testimonio anterior, entonces surge la oportunidad adecuada para ser contrainterrogado. Queda así garantizado el derecho constitucional del acusado a la confrontación. Claro está, como señala el profesor Chiesa:

> Nótese que la validez de la regla 63 supone que la parte afectada por la declaración tenga efectiva oportunidad de contrainterrogar al declarante con relación a la declaración anterior. De otra manera, se vulneraría fatalmente su derecho a confrontación, particularmente si se trata de un acusado. Si el testigo se niega a declarar, no permite el contrainterrogatorio, insiste en que no recuerda, etc., no puede aplicarse la regla y admitirse la declaración anterior bajo la regla 63, pues ésta supone la opor-

---

[7] Para algunos ejemplos de casos donde se reconoce la admisibilidad de declaraciones anteriores con propósitos sustantivos, véase J.B. Weinstein, *Case and Materials*, 7ma ed., Nueva York, Ed. Foundation Press, 1983, Sec. 3, pág. 595 *et seq.*

tunidad de contrainterrogar que se otorga a la parte afectada. Chiesa, *op. cit.*, pág. 314.

En el caso de autos, la defensa no sólo contrainterrogó amplia y efectivamente a Ricky, sino al Fiscal López Morales, quien le tomó las dos (2) declaraciones. Correspondía al juzgador darle el valor probatorio pertinente a esas declaraciones anteriores, confrontarlas con las variantes que el testigo introdujo en su testimonio en el tribunal, esto es, considerar todas las circunstancias en que éstas fueron tomadas y su comportamiento en sala.

Lo expuesto nos permite concluir que lo resuelto en *Pueblo v. Ríos Nogueras II*, supra, no es aplicable a las circunstancias de autos. Allí se trataba de un testigo *no* disponible en el tribunal para ser contrainterrogado porque había sido asesinado. Ante esa situación, resultaba inadmisible, para fines sustantivos, su declaración jurada prestada *ex parte* previamente a un fiscal.

## IV

En el *primero y decimoquinto* señalamiento los apelantes sostienen la insuficiencia de la prueba.

De entrada, vale aclarar que la admisibilidad de las declaraciones juradas de Ricky como prueba sustantiva, por sí no son suficientes para sostener la convicción de los acusados más allá de duda razonable. Aunque en *Pueblo v. Esteves Rosado*, supra, nos expresamos favorablemente acerca de la utilización y admisibilidad de una declaración anterior como evidencia sustantiva para fines de satisfacer el grado de evidencia necesaria para una determinación de causa probable en vista preliminar, hicimos claro que no "nos pronunciamos en cuanto a la suficiencia de esa prueba, por sí sola, para sostener una convicción que como cuestión de debido procedimiento exige prueba más allá de duda razonable". Íd., pág. 348 y esc. 32.

Al evaluar la suficiencia de la prueba de cargo para es-

tablecer la culpabilidad de un acusado —en casos como el de autos— surge el problema particular de enfrentarnos a declaraciones esencialmente inconsistentes del testigo principal (coautor) que directamente vincula a los acusados con los hechos delictivos. *Cf. United States v. Orrico*, 599 F.2d 113 (6to Cir. 1979); *Phillips v. Neill*, 452 F.2d 337 (6to Cir. 1971).

A priori, no podemos establecer una regla general absoluta expositiva de cuándo una declaración anterior, esencialmente incompatible con el testimonio en el tribunal y admitida con efecto sustantivo, es suficiente.[8] Cada caso debe verse conforme a sus circunstancias particulares. Ahora bien, cuando el Ministerio Público sólo cuente con el testimonio anterior para sustentar los cargos —y el testigo en sala presta un testimonio esencialmente incompatible— debe presentar evidencia *adicional* demostrativa de la confiabilidad de la declaración jurada. A tal efecto, puede presentar evidencia de las circunstancias que motivaron el cambio del testimonio en sala y que lo hacen falso o poco creíble, presión o intimidación de parte del acusado, familiar o tercera persona.

Rehusamos establecer una norma inflexible y aplicable a todos los casos en que la única prueba del Ministerio Fiscal sea una declaración anterior incompatible. Al enfrentarnos al asunto de la suficiencia de la declaración anterior, los tribunales deben tomar en cuenta los siguientes factores: relación e interés del declarante con el asunto ob-

---

[8] Véanse: J.M. Stalmack, *Prior Inconsistent Statements: Congress Takes a Compromising Step Backward in Enacting Rule*, 8 Loy. U. Chi. L.J. 251 (1977); W.J. Blakey, *Substantive Use of Prior Inconsistent Statements Under Federal Rules of Evidence*, 64 Ky. L.J. 3 (1975).

Ambos coinciden en que tal regla no puede establecerse y que todo dependerá de las circunstancias en cada caso.

El tribunal debe examinar cualquier evidencia circunstancial o directa presentada para sostener la convicción basada en la declaración anterior incompatible. *Cf.* J.B. Weinstein, *Judicial Conference, Second Circuit, A Discussion of Proposed Federal Rule of Evidence*, 48 R.F.D. 39, 65 (1969); Pub. Law 93-595, D. Rep. Núm. 93-1277, 93rd Cong; 2nd, Sess; Ed.1974, U.S.Code Cong. & Admin. News, págs. 7051, 7062-7063, esc. 21.

jeto de la declaración anterior; a qué persona o personas la hizo; lugar y ocasión; si el declarante era objeto de una investigación o estaba en custodia; presencia o ausencia de otras personas al momento de la declaración; si la declaración tiende a inculpar o exculpar al propio declarante; si está escrita o firmada; si fue grabada; si se ofrece la totalidad o sólo parte; presencia o ausencia de motivos de fabricación; si hay indicios de presión o coerción; si el relato es inherentemente creíble, y si existe evidencia corroborativa de su veracidad. *Cf. State v. A. Gross*, 121 N.J. 10 (1990).

Claro está, si la prueba demuestra que las inconsistencias en los testimonios no versan sobre cuestiones esenciales al establecimiento de los elementos constitutivos del delito imputado y su conección con el acusado, realmente no estamos ante un problema de insuficiencia del testimonio anterior. Nos referiremos más bien a lo esencialmente inconsistente o incompatible, a saber, aquella declaración en el tribunal que niega o pone en duda razonable lo declarado en la anterior por el testigo, *dirigida a establecer todos o alguno de los elementos constitutivos del delito y/o la conección del acusado con éstos*. Nótese que tales inconsistencias son decisivas, puesto que van a la médula misma de la controversia sobre la culpabilidad o no del acusado. *Cf. Weinstein's*, supra, Sec. 801-107.

## V

Apliquemos este trasfondo normativo al caso de autos. De la Exposición Narrativa surge suficiente evidencia que confirma la versión brindada por Ricky en su *primera* declaración jurada. Los testimonios de las viudas confirmaron cómo Ricky salió junto a las víctimas el día de los hechos y la existencia de viejas rencillas entre Cheo y Samuel Adorno. Los hallazgos de los agentes policíacos al realizar el allanamiento en la finca de los Adorno también robuste-

cen lo declarado originalmente por Ricky. Llama la atención de sobremanera el testimonio no contradicho del agente Maysonet en el sentido de haber visto al acusado Sammy, el día que descubrieron los cadáveres, montado a caballo y sin camisa, y luego encontrar la fosa con los cadáveres, el caballo ensillado y una camisa en una mata de plátano cercana al lugar.

Sabido es, de ordinario, que las declaraciones de un testigo hechas en una fecha cercana a los hechos generalmente son más confiables, pues la memoria está fresca y ha habido menos oportunidad de intervención de influencias indebidas. *Pueblo v. Esteves Rosado*, supra. De hecho, aquí el propio abogado del testigo Ricky negó que éste prestara una declaración a cambio de una rebaja en los casos pendientes, lo cual es compatible con lo afirmado en su segunda declaración sobre la intervención indebida de los acusados para tratar que variara su declaración original.

Por otro lado, la *segunda* declaración jurada de Ricky establece las circunstancias que motivaron el cambio de su testimonio en la vista preliminar, el cual es esencialmente el mismo prestado en el juicio, de manera que demuestren la falsedad o poca credibilidad que podía atribuírsele. La clara intimidación y presión que, según dicha declaración, ejercieron sobre su persona, incluso la amenaza de daño físico, milita contra la credibilidad del testimonio en el tribunal. *Correspondía al Jurado calibrar ambas declaraciones y dirimir los conflictos.* Los veredictos y fallos del juez reflejan que lo hicieron contra los acusados. En resumen, la prueba fue suficiente en derecho para sostener las convicciones. No intervendremos con el resultado.

Finalmente, los apelantes sostienen que los veredictos rendidos son contradictorios y sin ningún razonamiento lógico. No tienen razón. Ya en *Pueblo v. Medina Ocasio*, 98 D.P.R. 302, 305 (1970), dijimos que "aún cuando se trate de un mismo jurado, no es necesario demostrar consistencia lógica entre sus veredictos de culpabilidad en cuanto a

unos cargos y los de no culpabilidad en cuanto a otros, de una misma acusación o acusaciones que se le someten conjuntamente". Son válidos los veredictos inconsistentes. *Pueblo v. Pérez Rivera*, 110 D.P.R. 392 (1980); *Pueblo v. Cortés Calero*, 99 D.P.R. 679 (1975).

Tampoco es necesario que exista correspondencia entre el veredicto del Jurado en los cargos graves y el fallo emitido por el juez en los menos graves que surgen de un mismo evento o transacción. Ambos son juzgadores independientes. *Pueblo v. Medina Ocasio*, supra.

Por los fundamentos expuestos, *se dictará sentencia confirmatoria*.

El Juez Asociado Señor Hernández Denton emitió una opinión concurrente.

**– O –**

Opinión concurrente emitida por el Juez Asociado Señor Hernández Denton.

Por entender que bajo nuestro ordenamiento constitucional se debe requerir la corroboración en casos en los cuales la prueba principal de cargo consista en manifestaciones inconsistentes de un coautor de los hechos delictivos, concurrimos con la opinión del Tribunal. En el caso ante nos, la prueba sustantiva presentada por el Ministerio Público fue suficientemente corroborada. Por lo tanto, confirmaríamos el veredicto de culpabilidad.

I

Samuel (c/p Sammy), Cándido y Rubero Adorno Cabrera, y Carmelo Del Moral Avilés fueron acusados de asesinar en concierto y de común acuerdo el 7 de octubre de 1981 a José Miguel Orsini (c/p Cheo) y a Ángel Manuel Bruno Ramos (c/p Pocholo). Se les acusó, además, de ten-

tativa de asesinato contra Ángel Manuel Bruno Ramos y de varias infracciones a la Ley de Armas de Puerto Rico. El Jurado rindió un veredicto de culpabilidad en los delitos graves y el juez en los delitos menos graves.

La prueba del Ministerio Fiscal consistió de dos (2) declaraciones juradas prestadas por José Ricardo Ramírez Seijo (c/p Ricky), coautor. Éstas fueron admitidas como manifestaciones anteriores bajo la Regla 63 de Evidencia, 32 L.P.R.A. Ap. IV, al variar el testigo su testimonio en corte abierta.[1]

La primera declaración jurada fue prestada el 22 de marzo de 1982 ante el Fiscal Juan López Morales. En ésta, Ricky incriminaba a los cuatro (4) apelantes en los asesinatos y las violaciones a la Ley de Armas de Puerto Rico.[2] Las circunstancias bajo las cuales fue tomada la primera declaración jurada, prima facie, guardaron los requisitos de ley al Ricky estar representado por el abogado y haber sido advertido de sus derechos. Ricky, a través de su abogado, expresó el deseo de declarar a cambio de no ser acusado por los hechos delictivos. El Fiscal, al corroborar a través de sus propias observaciones la versión de Ricky, decidió utilizarlo como testigo y no acusarlo como coautor.[3]

En su declaración jurada de 22 de marzo de 1982 Ricky mencionó datos como: la apropiación ilegal de un (1) Dat-

---

[1] Además, se presentaron diversos testimonios, tales como: el de la viuda de Bruno Ramos, Evelyn Miranda; el del Fiscal investigador, Lcdo. Juan López Morales; el de la viuda de Ríos Orsini, Antonia Pérez Santana; el de la patóloga forense, Dra. Yocasta Brugal; el del agente Luis A. Maysonet; el del ganadero Isaac Pérez Rosado; el del Comandante de la Policía Edelmiro Rivera Falcón; el del agente del C.I.C. Heriberto Méndez De Jesús, y el del Lcdo. Emilio Hidalgo Nazario, abogado del testigo Ricky. La defensa no presentó ningún testigo.

[2] Véase la opinión mayoritaria para una descripción detallada de la declaración.

[3] Véase el esc. 5 de la opinión mayoritaria, pág. 851, en referencia a que "[e]l Fiscal López Morales señaló que tomó la decisión de otorgarle inmunidad a Ricky 'porque lo que dicho testigo le dijo corrobora unos cuantos aspectos que [yo] había observado en la Finca Pámpanos de Vega Alta el 21 de marzo de 1982; me habló de la casita alta en zocos, ranchones, letrina, el portón donde se dejó la guagua, el camino lo describió. Todo me era familiar con lo que yo había visto y concluí que el hombre estaba diciendo la verdad' ".

sun amarillo que se había quedado sin gasolina; las armas que portaban los acusados el día de los hechos (pistolas y escopeta); la descripción de la finca Pámpanos de Vega Alta (lugar donde ocurrieron los asesinatos); la existencia de una (1) guagua *pick-up* Ford roja utilizada en los hechos delictivos; su conocimiento de antiguas rencillas por motivo de faldas entre Samuel Adorno y José Miguel Orsini, y el haber acompañado a las víctimas el día de los hechos.

Posteriormente, en la vista preliminar de 3 de mayo de 1982, Ricky alteró sustancialmente su primera versión de los hechos, exonerando de toda culpa a los acusados, le imputó los asesinatos de Cheo y Pocholo a Justino Díaz Cabrera (c/p Tinito), a su hermano Randall y a un señor de tez trigueña, a quien no conocía. Éstos alegadamente emboscaron a Cheo, a Pocholo y a él. Ricky adujo haber sido torturado intensamente durante esa primera declaración ante el Fiscal Juan López Morales para inculpar a los acusados. Además, señaló que la Policía le hizo promesas, al efecto de ayudarlo en unos casos que tenía pendientes en los tribunales. Por estas razones, decidió "inventarse" la nueva versión de los hechos.

En el juicio, el Ministerio Público presentó la primera declaración jurada y el tribunal la admitió como prueba sustantiva. Durante el juicio, la defensa contrainterrogó extensamente a Ricky sobre las declaraciones anteriores, tanto durante la investigación como la prestada en la vista preliminar. Además, fue admitida en evidencia, como prueba sustantiva, una declaración jurada prestada el 4 de mayo de 1982. Esta segunda declaración jurada fue prestada luego de haber celebrado la vista preliminar y mientras Ricky se encontraba en la cárcel de Distrito de Humacao. Es en esta segunda declaración jurada cuando Ricky sostiene la veracidad de la primera declaración prestada el 22 de marzo de 1982. Explicó que la versión ofrecida por él en la vista preliminar fue producto de la intimidación ocasionada por los acusados con los cuales había

compartido una celda en el tribunal el día en que se iba a celebrar dicha vista. Los acusados, alegadamente, le ofrecieron "encargarse", a través de abogados, de sus casos pendientes y le prometieron una serie de favores a cambio de que no testificara contra ellos. Pero, sobre todo, le expresaron que "como chota no podía vivir en la cárcel"[4] y que "del cambio de su declaración dependía que siguiera viviendo".[5] Como si fuera poco, su esposa le llevó una carta de los Adorno donde le sugerían no declarar en su contra y, por el contrario, implicar a Tinito. Ricky admitió haberse inventado todo lo relatado en la vista preliminar a instancias y como consecuencia de la intimidación de los acusados.

Por otro lado, las declaraciones de los demás testigos de cargo tendieron a corroborar la primera declaración manifestada por Ricky el 22 de marzo de 1982.[6] Veamos: la viuda de Ángel Manuel Ramos (c/p Pocholo) testificó que el día de los hechos Ricky llegó a su casa "en un carro pequeño amarillo y llamó a Pocholo para que éste lo llevara a buscar gasolina"[7] para dicho auto; la Dra. Yocasta Brugal, patóloga forense que realizó las autopsias de los occisos, determinó que las heridas demostradas por los cadáveres fueron producidas por una escopeta; el Fiscal Juan López Morales testificó que decidió otorgarle inmunidad a Ricky porque su descripción de la finca en el barrio Pámpanos corroboraba lo observado por este Fiscal el 21 de marzo de 1982; José Molina Adorno, cuñado de los coacusados, testificó que en febrero de 1981 vendió una guagua Ford *pick-up* a Cándido Adorno Cabrera; la viuda de José Miguel Orsini (c/p Cheo) testificó sobre problemas que habían tenido Samuel y Cheo; además, la viuda de Pocholo confirmó que días antes de las muertes, su esposo le había

---

[4] Véase la opinión mayoritaria, pág. 849.

[5] Íd.

[6] Íd., págs. 850–855.

[7] Íd., pág. 850.

expresado que Cheo y él habían tenido un problema con los hermanos Rubero y Samuel Adorno. Ella misma testificó que el día de los hechos Ricky salió en compañía de Pocholo y Cheo, y que ésta fue la última vez que vio a Pocholo con vida.

## II

Al evaluar la controversia de autos partimos de la premisa de que bajo la Regla 63 de Evidencia de Puerto Rico, *supra*, las manifestaciones anteriores de un testigo sujeto a ser contrainterrogado, incompatibles con su testimonio en el tribunal, podrán utilizarse no sólo como prueba de impugnación, sino como prueba sustantiva. *Pueblo v. Esteves Rosado*, 110 D.P.R. 334 (1980). El testimonio del testigo en el juicio "coloca al juzgador en una posición satisfactoria para evaluar la veracidad y confiabilidad de ambas versiones del testigo —en caso de ser inconsistentes— ya que puede observar su [*demeanor* o] comportamiento al ser confrontado [en la silla testifical] con la declaración anterior y oír cualesquiera explicaciones que tenga que ofrecer en cuanto a la inconsistencia". *Pueblo v. Esteves Rosado*, supra, pág. 338. Véase *Weinstein's*, supra, Sec. 801(d)(1)(A)[03], pág. 801-150. Claro está, no se trata de admitir en evidencia como prueba sustantiva cualquier declaración anterior inconsistente, sino aquella que ponga en duda el establecimiento de alguno de los elementos del delito y/o la conección del acusado con éstos.

Ahora bien, existe una distinción entre la admisibilidad de las manifestaciones anteriores incompatibles como prueba sustantiva y su valor probatorio. En *California v. Green*, 399 U.S. 149, 170 (1970), el Tribunal Supremo federal sostuvo que cuando la única prueba existente para condenar al acusado consistiera de manifestaciones anteriores incompatibles, debe examinarse cuidadosamente la misma al momento de evaluar su suficiencia para sostener la con-

vicción del acusado más allá de toda duda razonable. Íd., pág. 170 y esc. 19. Véase, además, *United States v. Orrico*, 599 F.2d 113, 118 (6to Cir. 1979). Es nuestro criterio que, en aras de preservar las garantías constitucionales del acusado en cuanto a su presunción de inocencia hasta que no se pruebe su culpabilidad más allá de duda razonable, este Tribunal debe requerir corroboración cuando la única prueba de cargo o aquella sobre la cual descanse el peso de la prueba condenatoria, sean manifestaciones inconsistentes de un coautor.[8]

Dejar a la discreción única del juez o de un Jurado el aquilatar la confiabilidad y conferirle valor probatorio a ese tipo de evidencia sin mayor corroboración constituiría una violación al debido proceso de ley al que tienen derecho los acusados.

En las circunstancias particulares de este caso, las declaraciones juradas del coautor Ricky no eran suficientes, por sí solas, para sostener la convicción de los acusados más allá de toda duda razonable. Procedía corroborar, mediante los testimonios de otros testigos de cargo, la veracidad de la primera declaración del coautor Ricky.[9] Examinada la totalidad de estos testimonios, estamos de acuerdo con el dictamen apelado por entender que el foro de instancia corroboró de forma correcta las declaraciones anteriores del coautor.

---

[8] En *State v. Ramsey*, 782 P.2d 480 (Utah 1989), el tribunal admitió manifestaciones anteriores incompatibles como prueba sustantiva pero no las consideró suficientes para imponer culpabilidad, por no haber sido corroborada la prueba. En *State v. Mancine*, 590 A.2d 1107, 1117, 1119 (1991), el Tribunal Supremo de Nueva Jersey advirtió sobre el peligro de sostener una convicción fundada exclusivamente en las manifestaciones incompatibles de un testigo sin haber sido éstas corroboradas.

[9] Véase J.M. Stalmack, *Prior Inconsistent Statements: Congress Takes a Compromising Step Backward in Enacting Rule 801(d)(1)(A)*, 8 Loy. U. Chi. L.J. 251, 268 (1975).