# 2001 DTA 140

**TRIBUNAL DE CIRCUITO DE APELACIONES
CIRCUITO REGIONAL I DE SAN JUAN
PANEL SUSTITUTO**

OFICINA DE ETICA GUBERNAMENTAL
Recurrida

v.

NYDIA E. RODRIGUEZ MARTINEZ, LUIS A. COLON VILLAMIL Y
MARIEN CASANOVA GARCIA
Recurrentes

Núm. KLRA-00-00915

San Juan, Puerto Rico, a 3 de abril de 2001

Panel integrado por su Presidenta, la Juez López Vilanova,
y los Jueces Córdova Arone y Ortiz Carrión

## TEXTO COMPLETO DE LA SENTENCIA

La Lcda. Nydia E. Rodríguez Martínez (licenciada Rodríguez), recurre de una resolución dictada el 28 de julio de 2000 por la Oficina de Etica Gubernamental (OEG), mediante la cual se le impuso el pago de tres multas conjuntas por violaciones a la Ley y al Reglamento de Etica Gubernamental. A continuación, efectuamos una sinopsis de los hechos pertinentes.

### I

El 12 de enero de 1999, la Oficina de Etica Gubernamental (OEG), presentó una querella en contra de la licenciada Rodríguez, quien en ese entonces fungía como Presidenta de la Comisión de Servicio Público (la Comisión). Se le imputó, en síntesis, haber solicitado aportaciones económicas a varias compañías reguladas y con asuntos pendientes de resolver ante la Comisión para financiar la publicación de un suplemento conmemorativo del 80 aniversario de ésta. Esto, en violación al Art. VI, sec. 9 de la Constitución del Estado Libre Asociado de Puerto Rico; los Arts. 3.2 (a) y (c) de la Ley Núm. 12 de 24 de julio de 1985, conocida como la Ley de Etica Gubernamental del Estado Libre Asociado de Puerto Rico; y los Arts. 11(A), 8(F), 6, en sus incisos (A), (D), (E), (F) y 13(C), del Reglamento Núm. 4827 de 20 de noviembre de 1992, conocido como el Reglamento de Etica Gubernamental.

Luego de varios trámites procesales, los cuales es innecesario señalar, el 28 de julio de 2000, la OEG dictó la resolución recurrida.

A base de la evidencia presentada, la OEG formuló en su extensa y bien fundamentada resolución, entre

otras, las siguientes determinaciones de hechos:

"3.4 El 15 de agosto de 1997, la [licenciada Rodríguez], ejerciendo las facultades de su cargo de presidenta de la CSP, y ante los planes de la CSP de celebrar una 'convención' durante el mes de noviembre de 1997 con motivo del 80 aniversario de la CSP, firmó un 'contrato de servicios profesionales y consultivos' entre la CSP y la Sra. Marta Carbonell Acosta, el cūal disponía que esta última asesoraría a la CSP 'en la coordinación, organización y desarrollo de la convención, así como de un suplemento informativo conmemorativo a circularse a través de los medios de prensa del país'.

3.5 ...[L]a Sra. Maitá Carbonell subcontrató con Arta Promotions la promoción y preparación del referido suplemento...

3.6 La Sra. Laila Shwaiki, quien era empleada de Art Printing Inc.... fue encargada... para que 'diera seguimiento' a diversas empresas en cuanto a las 'aportaciones' que éstas habrían de hacer para cubrir el costo del suplemento... la Sra. Shwaiki les ofrecería... a cambio de su 'aportación' al suplemento, diversos 'beneficios' que dependerían del monto de la aportación que cada uno hiciera, entre ellos el derecho a exhibir su logo en el suplemento, y el recibir cierto número de invitaciones a la convención, en proporción a la cantidad de la aportación. Los que hicieran la aportación máxima de $10,000, podrían además tener un 'booth' en la convención, y su logo tendría más prominencia en el suplemento. Todo ello se planificó en reuniones en la propia CSP...

3.7 Mediante cartas idénticas, fechadas 29 de agosto de 1997, hechas en papel timbrado de la CSP, se cursaron invitaciones a treinta y dos (32) personas o empresas a un desayuno a celebrarse en el Latin American Café de Puerta de Tierra el 9 de septiembre de 1997. La carta hacía referencia a la convención antes mencionada, que la misma se llevaría a cabo en el Hotel Caribe Hilton el 7 de noviembre de 1997 y contaría con la asistencia del Gobernador Pedro Rosselló, que con motivo de ese evento, la CSP deseaba 'ofrecerle al pueblo de Puerto Rico un documento con información que refleje los servicios que ofrecemos, nuestras ejecutorias, logros y proyecciones', y terminaba diciendo que en el desayuno 'compartiremos con ustedes nuestros planes'. Durante la vista del caso se estipuló que de las 32 invitaciones, 16 iban dirigidas a personas o empresas... reglamentadas por dicha agencia.

3.8 El desayuno en cuestión se celebró según programado. Al mismo asistieron... 18 de las personas o empresas a las que se había enviado la carta de invitación ... seis (6) eran personas no reglamentadas por la CSP y los demás eran representantes de empresas reglamentadas ... Durante el desayuno se constató la asistencia a la actividad mediante una hoja con el encabezamiento 'Gobierno de Puerto Rico/Hoja de Asistencia' en la cual los presentes debían poner su nombre y su firma.

3.9 Durante el desayuno, la [Lcda. Rodríguez] se dirigió a los presentes, y les habló de los planes de la CSP para la convención, incluyendo el suplemento. Además presentó a la Sra. Maitá Carbonell Acosta como la persona que estaría a cargo del suplemento. La Sra. Carbonell se dirigió entonces a los presentes, y a su vez les presentó a la Sra. Laila Shwaiki como la persona que 'les iba a dar seguimiento' sobre 'la propuesta para la participación voluntaria' de ellos para el costo del suplemento.

3.10 Mediante cartas idénticas, fechadas 9 de septiembre de 1997, hechas en papel timbrado de la CSP y firmadas por [la licenciada Rodríguez] como presidenta de la CSP, se cursaron invitaciones a once (11) empresas a un almuerzo a celebrarse en el Restaurante Antonio's en el Condado el 16 de septiembre de 1997. La carta hacía referencia a la convención antes mencionada, que la misma se llevaría a cabo en el Hotel Caribe Hilton el 7 de noviembre de 1997 y contaría con la asistencia del Gobernador Pedro Rosselló, que con motivo de ese evento, la CSP deseaba 'ofrecerle al pueblo de Puerto Rico un documento con información que refleje los servicios que ofrecemos, nuestras ejecutorias, logros y proyecciones', y terminaba diciendo que en el desayuno 'compartiremos con ustedes nuestros planes'. Durante la vista del caso se estipuló que estas once invitaciones iban todas dirigidas a empresas reglamentadas por la CSP.

*3.11 El almuerzo en cuestión se celebró según programado. Al mismo asistieron... diversos representantes de diez de las once empresas a las que se había enviado la carta de invitación... Esas diez empresas todas estaban reglamentadas por la CSP. Durante el almuerzo se constató la asistencia a la actividad mediante una hoja con el encabezamiento 'Gobierno de Puerto Rico/Hoja de Asistencia' en la cual los presentes debían poner su nombre y su firma. La última firma que aparece en la hoja es 'Nydia Rodríguez'.*

*3.12 Durante el almuerzo, la [Lcda. Rodríguez] se dirigió a los presentes, y entre otras cosas les habló de la actividad del 80 aniversario de la CSP, incluyendo el suplemento, y les indicó que ella esperaba que todos ellos participaran en la actividad, que tendrían la oportunidad de tener un 'booth' en la misma, y les pidió que en la recaudación de fondos ayudaran en lo más que pudieran. Además, les presentó a la Sra. Maitá Carbonell como la persona que iba a estar a cargo de la actividad, y les daría los demás detalles sobre la misma. También les presentó a la Sra. Laila Shwaiki como la persona que estaría a cargo de recaudar los fondos...*

*3.13 Al final del almuerzo, la Sra. Shwaiki entregó a todos los invitados una 'propuesta' escrita en la que se sugería que cada empresa hiciera una aportación al suplemento, montante a diez mil dólares ($10,000) cada una. La propuesta iba dirigida individualmente a cada una de las empresas presentes en el almuerzo, y fue preparada en Art Printing Inc. por la Sra. Shwaiki con información sobre dichas empresas que le fue enviada por FAX desde la CSP...*

*...*

*3.16 Por sus gestiones... la Sra. Shwaiki recibía... una comisión basada en el monto total de las aportaciones que ella consiguiera para el suplemento. Durante su testimonio, la Sra. Shwaiki expresó no recordar el monto de dicha comisión. Sin embargo, surge de la evidencia documental estipulada que recibió la suma de $2,000, que equivale a poco más del 3% del total de $63,500 que aportaron los diversos auspiciadores del suplemento.*

*3.17 Una de las empresas a las cuales la Sra. Shwaiki 'dio seguimiento' sobre la aportación al suplemento fue Tropigas de Puerto Rico, que se dedica a la distribución de gas propano en Puerto Rico, y está reglamentada por la CSP. La gestión de la Sra. Shwaiki con Tropigas fue a través de la Sra. Wanda Marrero, quien para aquel entonces era 'Plans and Program Manager' de Tropigas...*

*3.18 La primera gestión de seguimiento de la Sra. Shwaiki fue enviar un FAX a la Sra. Marrero, que se recibió en la oficina de ésta antes de ella regresar a la misma después del almuerzo ... la Sra. Marrero (que era quien atendía los asuntos de Tropigas ante la CSP) se preocupó de que la situación 'podía perjudicar' a Tropigas en esos asuntos, de los que había varios pendientes en ese momento, si en la CSP pensaban que Tropigas no quería cooperar, y que 'la fueran a coger contra uno o algo'. Aunque ella no se sintió personalmente amenazada, sí se sintió comprometida, ya que pensó que Tropigas iba a 'lucir muy mal' ante la CSP si no participaba en el suplemento. Finalmente, el presidente de Tropigas decidió aportar la suma completa de $10,000, 'para estar igual que la competencia', luego de que la Sra. Shwaiki informó a Tropigas que varios competidores suyos habían aportado esa suma.*

*...*

*3.21 Otra de las empresas a las cuales la Sra. Shwaiki 'dio seguimiento' sobre la aportación al suplemento fue Light Gas Corporation... empresa reglamentada por la CSP. Las gestiones de la Sra. Shwaiki con esta empresa fueron a través de su presidente, el Sr. Julio Feliciano Gutiérrez...*

*3.22 Las gestiones de seguimiento en este caso incluyeron llamadas telefónicas de la Sra. Shwaiki al Sr. Feliciano 'casi todos los días'. Al principio, la Sra. Shwaiki pidió que Light Gas diera la suma completa de $10,000. Cuando el Sr. Feliciano le dijo que no podían pagar eso... ella le contestó que se lo iba a notificar a la presidenta de la CSP. El Sr. Feliciano consideró ese comentario de la Sra. Shwaiki como una presión, y se*

*sintió molesto por la situación. Eventualmente, Light Gas hizo una aportación de $2,500 al suplemento, ya que el Sr. Feliciano se sintió y pensó que si no aportaba nada, ello podía causar un efecto adverso a su empresa frente a la CSP. Aportó esos $2,500 por considerar que 'tenía que darlos' por tratarse de la CSP que era 'la dueña de mi franquicia'. En ese momento, Light Gas se encontraba en proceso de renovación de su licencia emitida por la CSP.*

...

*3:24 Al final del proceso de solicitudes de y conforme la prueba documental estipulada, Arta Promotions recogió un total de 18 aportaciones separadas para el suplemento que sumaron $63,500.00...*

*3.25 ... del total de $63,500 en auspicios, la cantidad de $61,000... fue contribuida directa o indirectamente por empresas reglamentadas por la CSP...*

*3.26 ... Arta Promotions tuvo gastos montantes a $52,470... En definitiva, Arta Promotions tuvo ganancias netas de $11,030 ($63,500 - 52,470= $11,030), a parte de las ganancias que pueda haber tenido Art Printing Inc. como impresora."*

Así, pues, de las violaciones imputadas, fueron probadas aquellas estatuidas en los Arts. 3.2(a) y (c) de la Ley de Etica Gubernamental y en los Arts. 11(A) y 6, en sus incisos (A), (D), (E) y (F) del Reglamento de Etica Gubernamental. La OEG le impuso a la licenciada Rodríguez una multa de $10,000.

La OEG concluyó que las actuaciones de la licenciada Rodríguez crearon una clara presión sicológica sobre las empresas reglamentadas por la agencia que presidía. Igualmente, el hecho de que durante el almuerzo y el desayuno ésta presentó a las personas encargadas de la recaudación de fondos, dio credibilidad y respaldo oficial, ante los ojos de los asistentes, a los actos de recaudación de fondos efectuados posteriormente por la señora Shwaiki.

La OEG concluyó que las ganancias económicas recibidas por Arta Promotions y Art Printing no se hubiesen hecho realidad sin la ayuda que brindó la licenciada Rodríguez desde su posición oficial en la Comisión, todo como parte de un esquema diseñado para beneficiar económicamente a Arta Promotions.

Insatisfecha con tal decisión, la licenciada Rodríguez recurrió ante este Tribunal. Le imputa a la OEG haber incidido al: (1) admitir en evidencia una deposición tomada al Sr. Julio Feliciano como parte del proceso investigativo; (2) emitir una decisión alegadamente arbitraria, caprichosa, irrazonable y no sustentada por la totalidad de la evidencia; (3) adoptar el informe del oficial examinador; y (4) imponer una multa exagerada, injusta e irrazonable, constitutiva de una penalización múltiple por las mismas violaciones. La OEG compareció mediante escrito en oposición. Evaluados los escritos de las partes y sus voluminosos apéndices, procedemos a resolver.

## II

La licenciada Rodríguez en el primer señalamiento de error contenido en su escrito de revisión, sostiene que la OEG erró al admitir en evidencia, al amparo de la Regla 63 de las de Evidencia, una deposición tomada al Sr. Julio Feliciano durante el proceso investigativo que desembocó en la presentación de la querella en contra de ésta. Cataloga la misma como ex-parte y como una negación al derecho que le asiste de confrontar al señor Feliciano. Sostiene que la deposición fue admitida tentativamente y que nunca se adjudicó finalmente su admisión. Finalmente, se queja de que la OEG presentó la deposición, no con el fin de impugnar o confrontar al testigo, sino para ampliar su testimonio, por lo que no es admisible al amparo de las Reglas de Evidencia. No le asiste la razón.

Un detenido examen de los voluminosos autos, revela que todos los argumentos que la licenciada Rodríguez presenta en apoyo de su contención descansan en una versión distorsionada del incidente relativo a la

admisión de la deposición. Así, pues, nos vemos obligados a narrar éste, según surge de los autos.

El 21 de marzo de 2000, durante la continuación de la vista administrativa, ante el reclamo de la OEG de que se admitiera la deposición del señor Feliciano, el oficial examinador decidió admitir la misma, al amparo de la Regla 63 de las de Evidencia.

El oficial examinador, aunque admitió la deposición, le permitió a la licenciada Rodríguez que, una vez terminada la vista ese día, presentara una moción en la que esgrimiera argumentos que sustentaran su postura de que la deposición no era admisibile. Si ocurriese tal eventualidad, no se tomaría en cuenta la deposición y, en consecuencia, no se consideraría la porción del contrainterrogatorio del señor Feliciano relativa a ésta. ■

El oficial examinador le concedió a la representación legal de la licenciada Rodríguez la oportunidad de contrainterrogar en la vista al señor Feliciano. ■ Sin embargo, la representación legal de la licenciada Rodríguez no contrainterrogó al señor Feliciano en cuanto a su declaración anterior. ■

La licenciada Rodríguez no presentó posteriormente fundamento alguno en contra de la admisión de la deposición. El 30 de mayo de 2000, el oficial examinador dio por sometido el caso con la prueba y los escritos presentados por las partes hasta esa fecha.

Así, pues, con la realidad fáctica ante nuestros ojos, examinemos el derecho aplicable. La sección 3.13 (e) de la Ley Núm. 170 de 12 de agosto de 1988, conocida como la Ley de Procedimiento Administrativo Uniforme, LPAU, 3 L.P.R.A. sec. 2163, dispone que *"[l]as Reglas de Evidencia no serán aplicables a las vistas administrativas"*. Ello con el fin de evitar las trabas procesales de los tribunales de justicia y en el ánimo de que el proceso administrativo sea ágil y sencillo, de modo que propicie su uso eficiente por parte de las personas legas. *López Vives v. Policía de Puerto Rico*, 118 D.P.R. 219, 231 (1987).

Sin embargo, nada impide que en determinadas ocasiones se adopten los principios o las normas de estas reglas cuando las mismas no sean incompatibles con los procesos administrativos y propicien una solución justa, rápida y económica. Secc. 3.13 de la Ley Núm. 170, 3 L.P.R.A. secc. 2163; *Ind. Cortinera Inc. v. P.R. Telephone Co.*, 132 D.P.R. 654, 660 (1993); *Pérez Rodríguez v. P.R. Park. Systems, Inc.*, 119 D.P.R. 634, 639-640 (1987); *Berríos v. Comisión de Minería*, 102 D.P.R. 228, 229-230 (1974).

Sin embargo, aun considerado el planteamiento de la licenciada Rodríguez bajo el crisol restrictivo de nuestras Reglas de Evidencia, el mismo no prosperaría.

La Regla 63 de Evidencia, 32 L.P.R.A. Ap. VI, R. 63, relativa a declaraciones anteriores de un testigo, dispone que:

*"Es admisible como excepción a la regla de prueba de referencia una declaración anterior de un testigo que está presente en el juicio o vista y sujeto a ser contrainterrogado en cuanto a la declaración anterior, siempre que dicha declaración fuere admisible de ser hecha por el declarante declarando como testigo."*

Del texto de la regla se desprenden tres requisitos: (1) el testigo tiene que estar presente en el juicio o vista; (2) sujeto a ser contrainterrogado en cuanto a la declaración anterior; y (3) es necesario que la declaración sea susceptible de ser admitida como prueba sustantiva de lo declarado.

En la medida que el testigo está presente y disponible para ser contrainterrogado, la parte contra la que se presenta la evidencia cuenta con plena oportunidad de confrontar al testigo. *Pueblo v. De Jesús Ayuso*, 119 D.P. R. 21, 31-33 (1987).

Bajo el palio de la Regla 63 de las de Evidencia, *supra*, la declaración anterior de un testigo, similar o

compatible con su testimonio en corte, no sólo es admisible para rehabilitar al testigo si éste es impugnado mediante otra declaración incompatible, con su testimonio en corte, sino que, además, es admisible como prueba sustantiva para fortalecer la posición de la parte que presenta a dicho testigo. *Pueblo v. Adorno Cabrera*, 133 D.P.R. 839 (1993); *Pueblo v. Esteves Rosado*, 110 D.P.R. 334 (1980).

La aplicación de esta normativa a los hechos del caso, revela lo improcedente del error apuntado. La deposición prestada por el señor Gutiérrez fue admitida por el oficial examinador, toda vez que éste declaró en la vista administrativa y estuvo disponible para un amplio contrainterrogatorio por parte de la representación legal de la licenciada Rodríguez en torno a los aspectos pertinentes de dicha declaración. Sin embargo, como vimos con anterioridad, ésta decidió no contrainterrogar al testigo. Definitivamente, la deposición es admisible como prueba sustantiva para fortalecer la posición de la OEG.

## III

En segunda instancia, la licenciada Rodríguez cuestiona las determinaciones de hechos formuladas por la OEG en cuanto a su participación en el esquema para beneficiar a Arta, específicamente la presentación en el desayuno y en el almuerzo de la señora Shwaiki y la exhortación a los asistentes al almuerzo de que cooperaran en lo más que pudieran. Además, ataca la determinación de hechos 3.16 (relativa al porciento de comisión de la señora Shwaiki); ▮ y una nota al calce contenida en la determinación de hechos 3.19, la cual lee así:

*"Nótese que la decisión del presidente de Tropigas de aportar $10,000 al suplemento para 'estar igual que la competencia' se puede interpretar de más de una forma. Podría significar una decisión puramente comercial, basada en un deseo de Tropigas de quedar igual que la competencia ante los ojos del público consumidor, por la exposición que tendrían durante la actividad del aniversario y por su anuncio en el suplemento. Pero podría, en vez, significar una decisión de estrategia con relación a los procesos de reglamentación a los que la empresa estaba sujeta, basada en un deseo de Tropigas de quedar igual que la competencia ante los ojos de los funcionarios de la CSP."*

Examinemos las normas que circunscriben el alcance de la revisión judicial de las determinaciones de hechos efectuadas por una agencia administrativa. La sección 4.5 de la Ley Núm. 170 de 12 de agosto de 1988, conocida como la Ley de Procedimiento Administrativo Uniforme, 3 L.P.R.A. sec. 2175, dispone que las determinaciones de hechos formuladas por una agencia administrativa serán sostenidas por los tribunales, si se basan en evidencia sustancial que obra en el expediente administrativo. De conformidad con la doctrina de evidencia sustancial, las determinaciones de hechos de una agencia administrativa serán respetadas por los tribunales, si se basan en una interpretación razonable de la prueba.

Es evidencia sustancial aquélla que una mente razonable podría aceptar como adecuada para sostener una conclusión, *Hilton Hotel International v. Junta de Salario Mínimo*, 74 D.P.R. 670, 687 (1953), aunque exista prueba conflictiva de la cual puedan inferirse conclusiones distintas a las que la agencia adopta. *Junta de Relaciones del Trabajo v. Línea Suprem*, 89 D.P.R. 846 (1964). Según esta doctrina, la intervención del Tribunal está limitada a evaluar si la decisión de la agencia es razonable y no si efectuó una determinación correcta de los hechos que tuvo ante su consideración. Si existe más de una interpretación razonable de los hechos, los tribunales, de ordinario, debemos sostener la selección de la agencia y no sustituir nuestro criterio por el de la agencia. *Assoc. Ins. Agencies, Inc. v. Com. Seg. P.R.*, 144 D.P.R. __, **97 J.T.S. 142**.

El Tribunal Supremo ha establecido que la determinación de una agencia no está basada en evidencia sustancial cuando la parte recurrente demuestra la existencia de *"otra prueba en el récord que razonablemente reduzca o menoscabe el peso de tal evidencia, hasta el punto de que un tribunal no pueda, concienzudamente, concluir que la evidencia sea sustancial, en vista de la prueba presentada... y hasta el punto que se demuestre claramente que la decisión [del organismo administrativo] no está justificada por una evaluación justa del peso de la prueba que tuvo ante su consideración". Metropolitana S.E. v. A.R.P.E.*, 138 D.P.R. __ (1995), **95 J. T.S. 39**.

Debe mantenerse presente que las determinaciones de hechos de organismos y agencias públicas tienen a su favor una presunción de regularidad y corrección que debe ser respetada mientras la parte que las impugne no produzca suficiente evidencia para derrotarlas. *Rivera Concepción v. A.R.P.E.*, **2000 J.T.S. 155**, a la pág. 160.

Es doctrina jurisprudencial, reiteradamente sostenida, aquélla que establece que las conclusiones e interpretaciones de los organismos administrativos especializados merecen gran consideración y respeto. La deferencia que debemos a las determinaciones de hechos del organismo administrativo, sólo puede obviarse si existe arbitrariedad, ilegalidad o irrazonabilidad de parte de la agencia, o cuando tales determinaciones no encuentren apoyo en evidencia sustancial existente en la totalidad del récord. *Municipio de San Juan v. Junta de Calidad Ambiental*, **2000 J.T.S. 193**; *Misión Ind. P.R. v. J.C.A.*, 145 D.P.R. __, **98 J.T.S. 77**.

Hiere todo sentido de respeto a este Tribunal el que la licenciada Rodríguez se limite, sin más, a atacar las antes dichas determinaciones de hechos formuladas por la OEG, con el descarnado argumento de que en el expediente no existe prueba alguna que justifique las mismas. ■ La licenciada Rodríguez no demostró la existencia de otra prueba en el récord que razonablemente reduzca o menoscabe el peso de la evidencia en la cual se basó la OEG para formular sus determinaciones de hechos, hasta el punto de que no podamos, concienzudamente, concluir que la evidencia es sustancial, en vista de la prueba presentada y hasta el punto que demuestre claramente que la decisión de la OEG no está justificada por una evaluación justa del peso de la prueba que tuvo ante su consideración. *Metropolitana S.E. v. A.R.P.E., supra.*

La licenciada Rodríguez se limitó a impugnar las determinaciones de hechos, sin producir evidencia alguna para derrotarlas. *Rivera Concepción v. A.R.P.E., supra.* Sobre ésta recaía el peso de probar que las determinaciones de hechos de la OEG son arbitrarias, irrazonables o que se tomaron en ausencia de evidencia sustancial. Las determinaciones de la OEG están sostenidas por abundante evidencia sustancial obrante en el expediente administrativo. Estas se cimentan en una interpretación razonable de la prueba. En vista de ello, no se cometió el segundo señalamiento de error apuntado por la licenciada Rodríguez en su escrito de revisión.

## IV

En su tercer señalamiento de error, la licenciada Rodríguez ataca ciertas conclusiones de derecho contenidas en la resolución recurrida.

Al ejercer nuestra función revisora, es menester recordar que las conclusiones de derecho que efectúan las agencias administrativas son revisables en todos sus aspectos por el tribunal. Secc. 4.5 de LPAU, *supra*. Sin embargo, esto no significa que al ejercer nuestra función revisora, podamos descartar las mismas libremente. Al contrario, hay que tener en cuenta que las mismas nos merecen deferencia. *Puerto Rico Telephone Company v. Junta Reglamentadora*, **2000 J.T.S. 98**, a la pág. 1266; *Ramírez v. Depto. De Salud*, 147 D.P.R. __, **99 J.T.S. 47**, a la pág. 818.

La licenciada Rodríguez cuestiona en primer lugar el que la OEG haya concluido que violó el Art. 3.2 (a) de la Ley de Etica Gubernamental. Sostiene que todas las actividades y gestiones iban dirigidas a la consecución de un fin público, por lo que no obtuvo beneficio económico alguno en su carácter personal. ■ Además, que no se probó ningún esquema ingeniado para beneficiar a Arta; al contrario, ésta realizó unos servicios legítimos, por los cuales recibió pagos legítimos. Veamos.

El Art. 3.2 (a) de la Ley de Etica Gubernamental, 3 L.P.R.A. sec. 1822, establece que:

*"Ningún funcionario o empleado público desacatará, ya sea personalmente o actuando como servidor público, las leyes en vigor, ni las citaciones u órdenes de los Tribunales de Justicia, de la Rama Legislativa o de las agencias de la Rama Ejecutiva que tengan autoridad para ello."*

La OEG encontró que la licenciada Rodríguez violó este artículo al usar propiedades y fondos públicos para

fines que no eran públicos, en contravención con el mandato constitucional. █ Esta usó papel timbrado de la Comisión en el cual se imprimieron las invitaciones al desayuno y al almuerzo, hojas de asistencia con el encabezamiento que leía *"Gobierno de Puerto Rico"* y, en fin, llevó a cabo las gestiones de solicitación de fondos en horas laborables mientras debía realizar sus labores fiscalizadoras como presidenta de la Comisión, por las que recibía su sueldo, todo ello para beneficio de Arta Promotions. En efecto, la violación al Art. 3.2 (a) de la Ley de Etica fue cometida.

La licenciada Rodríguez alega que tampoco debió concluirse que violó los Arts. 3.2 (e) de la Ley de Etica Gubernamental y 11 (A) del Reglamento de Etica Gubernamental. Plantea que la OEG sostiene las violaciones porque alegadamente se benefició la Comisión y que, sin embargo, la Ley y el Reglamento de Etica Gubernamental no contemplan a la agencia como *"persona"* sujeta a recibir beneficios.

El Art. 3.2 (c) de la Ley de Etica reza así:

*"Ningún funcionario o empleado público utilizará los deberes y facultades de su cargo, ni la propiedad o fondos públicos para obtener, directa o indirectamente, para él, para algún miembro de su unidad familiar, ni para cualquier otra persona, negocio o entidad, ventajas, beneficios o privilegios que no estén permitidos por ley."* (Enfasis suplido)

Por su parte, el Art. 11 (A) del Reglamento dispone que:

*"Ningún funcionario o empleado público solicitará o aceptará, de persona alguna, directa o indirectamente, para él, para algún miembro de su unidad familiar o para cualquier otra persona, regalos, gratificaciones, favores, servicios, donativos, préstamos o cualquier otra cosa de valor monetario de una persona que:*

*1) Tenga o esté tratando de obtener relaciones contractuales, comerciales o financieras con su agencia.*

*2) Efectúe negocios o actividades que estén reglamentadas por su agencia.*

*3) Tenga intereses que puedan ser sustancialmente afectados por el cumplimiento o incumplimiento de sus deberes oficiales."*

Nuevamente, nos enfrentamos a argumentos carentes de base en un intento frívolo de la licenciada Rodríguez de lograr la revocación de la resolución recurrida. Resulta intrascendente considerar si la Comisión está incluida en el término *"persona"*, a los efectos de los artículos mencionados, toda vez que la OEG concluyó que la entidad beneficiada con el esquema antiético fue Arta █ y no la Comisión.

Así, pues, quedó probado que la licenciada Rodríguez, usando los deberes y facultades de su cargo, solicitó tanto directa (al exhortar en el almuerzo a los asistentes a que cooperasen en lo más que pudieran); como indirectamente (al presentar en el desayuno y en el almuerzo a la señora Shwaiki como la encargada de la recaudación de fondos, dándole así su respaldo oficial a las gestiones y presiones indebidas de ésta); aportaciones económicas a empresas reglamentadas por la Comisión. Definitivamente, la OEG no erró al concluir que la licenciada Rodríguez cometió las antes dichas violaciones.

Finalmente, la licenciada Rodríguez arguye que la OEG incurrió en error al determinar que violó el Art. 6 del Reglamento de Etica Gubernamental. Sostiene que las actuaciones de la licenciada Rodríguez son cónsonas con una supuesta práctica generalizada en las agencias administrativas de *"...participación conjunta entre agencias del gobierno y empresas privadas para promover acciones en beneficio del interés público...".* █ La licenciada Rodríguez plantea que ante la ausencia de pronunciamiento de la OEG condenando esta práctica, ahora la agencia está impedida de considerar la misma como una violación ética.

El Art. 6 (A) del Reglamento, relativo a los deberes de todo servidor público, estatuye que éstos deberán:

*"Evitar tomar cualquier acción, esté o no específicamente prohibida por este Reglamento, que pueda resultar en o crear la apariencia de:*

*1) Usar las facultades de su cargo, propiedad o fondos públicos para un fin privado.*

*2) Dar trato preferencial a cualquier persona, salvo justa causa.*

*3) Impedir o entorpecer la eficiencia y la economía gubernamental.*

*4) Perder su completa independencia o imparcialidad.*

*5) Tomar una decisión fuera de los canales oficiales.*

*6) Afectar adversamente la confianza del público en la integridad y honestidad de las instituciones gubernamentales.*

*7) Promover una acción oficial sin observar los procedimientos establecidos."*

Por su parte, los incisos (D), (E) y (F) del Reglamento de Etica estatuyen que todo servidor público deberá:

*"(D) Evitar incurrir en conducta criminal, infame o lesiva al buen nombre de la agencia ejecutiva para la cual trabaja o al Gobierno de Puerto Rico.*

*(E) Evitar incurrir en prevaricación o conducta inmoral.*

*(F) Evitar utilizar su posición oficial para fines privados, político-partidistas o para otros fines no compatibles con el servicio público."*

Ciertamente, la licenciada Rodríguez violó estas disposiciones reglamentarias. Como vimos con anterioridad, ésta usó las facultades de su cargo, propiedades y fondos públicos, para un fin privado: enriquecer las arcas de Arta, afectando así la confianza del público en la integridad y honestidad de las instituciones gubernamentales.

No podemos perder de perspectiva que la licenciada Rodríguez cursó invitaciones (en papel timbrado de la Comisión, firmadas por ella como presidenta) a un almuerzo y a un desayuno a empresas reglamentadas por la agencia que dirigía; que en ambas actividades presentó a la señora Shwaiki como la encargada de la recolección de las aportaciones económicas, dándole así respaldo oficial a las gestiones y presiones indebidas efectuadas por ésta; que en el almuerzo exhortó a los asistentes a que cooperasen en lo más que pudieran. Son estas actuaciones ilegales y lesivas al buen nombre de la Comisión, las que sancionó la OEG. No podemos cubrir las mismas bajo un manto de aparente legalidad como es la publicación del suplemento y, mucho menos, excusarlas con el argumento de la existencia de una práctica administrativa usual en las demás agencias del gobierno.

La conducta de la licenciada Rodríguez dista mucho de aquélla que se espera de los funcionarios públicos. La Ley de Etica Gubernamental fue aprobada en el ánimo de restaurar la confianza del pueblo en su gobierno y en sus funcionarios públicos, para prevenir y penalizar el comportamiento delictivo de aquellos funcionarios que, en el desempeño de sus labores gubernamentales, vulneren los principios básicos de una ética de excelencia. Exposición de Motivos de la Ley de Etica.

De todo funcionario público se espera una conducta transparente e intachable, cuyo norte sea servir al pueblo con rectitud y honestidad. Como bien dijo el senador Izquierdo Stella en el debate del proyecto que constituyó la génesis de la Ley de Etica Gubernamental, la mayor riqueza de los funcionarios públicos tiene que ser la oportunidad que se les brinda de servirle bien al Pueblo de Puerto Rico.

## V

En el último señalamiento de error, la licenciada Rodríguez sostiene que la OEG incidió al imponerle una multa exagerada, injusta e irrazonable, ya que no guarda proporción con las violaciones cometidas y, además, constituye una penalización múltiple por las mismas violaciones.

En *Assoc. Ins. Agencies, Inc. v. Com. Seg. P.R.*, 144 D.P.R. __ (1997), **97 J.T.S. 142**, el Tribunal Supremo expresó que cuando una agencia administrativa emite sanciones, se le reconoce mucha discreción para seleccionar las sanciones que le ayuden a cumplir con los objetivos estatutarios, siempre que haya obrado dentro del marco de su conocimiento especializado y de la ley. Al revisar estas decisiones, las mismas nos merecen mucha deferencia a tenor con el principio de que la Asamblea Legislativa le ha delegado la facultad y la discreción a la agencia de seleccionar la manera de implantar la ley. La vasta experiencia y conocimiento especializado que las agencias adquieren en el proceso de la reglamentación, justifica esta norma.

La OEG le impuso a la licenciada Rodríguez una multa total de $10,000. Se desprende de la resolución recurrida, que tal suma, el oficial examinador la desglosó de la siguiente manera: $4,000 por violar el Art. 3.2 (c) de la Ley de Etica y el Art. 11 (A) del Reglamento, referentes a las prohibiciones específicas de que los servidores públicos usen su posición oficial para solicitar fondos a beneficio de personas o entidades particulares; $3,000 por violar el Art. 3.2 (a) de la Ley de Etica y el Art. 6 del Reglamento en sus incisos (E) y (F), relativas a la prohibición de usar propiedad pública para fines privados; y $3,000 por violar el Art. 6 del Reglamento, en sus incisos (A) y (D), sobre la prohibición de incurrir en conducta que afecta la confianza pública en las agencias gubernamentales. No erró al así decidir.

Las multas impuestas fueron razonables, considerando la magnitud de las violaciones éticas incurridas por la licenciada Rodríguez. Además, se enmarcaron dentro del ámbito permitido por LPAU. [10] Para concluir, fueron agrupadas de conformidad al carácter de las violaciones éticas. No encontramos fundamento alguno que nos mueva a intervenir con la multa conjunta impuesta.

## VI

Por los fundamentos expuestos, se resuelve expedir el auto y confirmar el dictamen recurrido.

Notifíquese.

Lo acordó y manda el Tribunal y lo certifica la Secretaria General.

Aida Ileana Oquendo Graulau
Secretaria General

### ESCOLIOS 2001 DTA 140

1. Págs. 114, 149 y 150 de la transcripción de la vista del 21 de marzo de 2000.

2. Pág. 174 de la transcripción de la vista del 21 de marzo de 2000.

3. Págs. 175 y 176 de la transcripción de la vista de 21 de marzo de 2000.

4. En cuanto al porciento de comisión recibido por la Sra. Shwaiki, si bien ésta testificó no recordar el mismo, como acertadamente sostiene la OEG, este dato surge de la evidencia documental estipulada.

5. Pág. 11 del escrito de revisión.

6. El alegado fin público era dar a conocer la historia de la Comisión, sus funciones, jurisdicción, obligaciones de sus concesionarios, derechos de los usuarios y mantener al Pueblo informado. Pág. 13 del escrito de revisión.

**7.** Art. VI, sec. 9 de la Constitución.

**8.** Sus ganancias ascendieron a $11,030.

**9.** Pág. 21 del escrito de revisión.

**10.** La secc. 7.1 de LPAU, 3 L.P.R.A. sec. 2201, establece que:

*"Toda violación a las leyes que administran las agencias o a los reglamentos emitidos al amparo de las mismas, podrá ser penalizada con multas administrativas que no excederán de cinco mil (5,000) dólares por cada violación."*