TEXTO COMPLETO DE LA SENTENCIA
Comparece Pueblo de Puerto Rico, por conducto del Procurador General, en el interés de obtener la revocación de una Sentencia emitida por el Tribunal de Primera Instancia, Sala Superior de Caguas. Mediante la misma, aunque el dictamen debió emitirse como resolución, el Tribunal declaró Con Lugar una solicitud de desestimación por el fundamento de la Regla 64 (p) de Procedimiento Criminal, presentada por la representación legal de Jannette Carrasquillo Torres. La recurrida fue acusada de Asesinato en Segundo Grado en relación con la muerte de su hija de cuatro (4) años de edad, luego de que la autopsia reflejara signos de un patrón constante de maltrato físico hacia la niña.
Luego de examinar los autos junto a las extensas y elocuentes comparecencias de las partes, por los fundamentos que habremos de exponer, se expide el auto de certiorari solicitado, se revoca la resolución recurrida y se devuelve el caso para la continuación de los procedimientos.
I. HECHOS
El 23 de octubre de 2000, el Ministerio Público denunció a la recurrida Jannette Carrasquillo Torres por el delito de asesinato en segundo grado por la muerte de su hija. La denuncia, entre otras cosas, contiene lo siguiente: “El referido acusado [sic]..., allá o para el día 9 de octubre de 2000,...ilegal, voluntaria y maliciosamente, con la intención criminal y con malicia, premeditada, dio muerte al ser humano Yamillette González Carrasquillo de cuatro años de edad, quien es su hija biológica, consistente en que cooperó con un patrón de maltrato contra la menor por parte de Luis Vélez Calderón quien le propinaba fuertes golpes en *728 ambos costados, abdomen, cabeza y otras partes del cuerpo que le produjeron un severo trauma corporal cuya consecuencia le causó la muerte.”
Se determinó causa probable para arresto por el delito imputado. Sin embargo, en la vista preliminar celebrada el 21 de febrero de 2001 se determinó que no existía causa probable para acusar a la recurrida, pero sí contra Luis Vélez Calderón quien era su compañero consensual.
Vélez Calderón trabajaba como Agente Investigador para la Policía de Puerto Rico. Según reflejó la autopsia, en el cuerpo de la niña se encontraron señales de un patrón constante de maltrato físico. Posteriormente, Vélez Calderón resultó culpable por el delito de homicidio voluntario. (Pueblo v. Luis Vélez Calderón, CRIM NUM: EVI2001G0006.)
Volviendo al caso que nos ocupa, el Ministerio Público no estuvo conforme con la determinación de no causa probable contra Jannette, por lo que solicitó la celebración de una vista preliminar en alzada. En dicha vista se halló causa probable para acusar por asesinato en segundo grado. La única declaración jurada que fue admitida en evidencia fue la de Rosa María Orellano Rosario, técnica de servicios a familias y niños en el Departamento de la Familia. La Sra. Orellano relató en la declaración jurada las circunstancias y razones por las cuales le refirieron el caso de la hija de la acusada, cuando la niña aún vivía. Veamos:
“El 27 de septiembre de 2000, me fue asignada para investigación la situación de la menor Yamillette González Carrasquillo, a través de un referido que envió la trabajadora social escolar, Sra. Elizabeth Correa, de la Escuela Nereida Alicea. En este referido informaba que el 8 de septiembre de 2000, la niña Yamillette González presentaba golpes en los brazos y piernas; que había intervino [sic] con la mamá de la menor, Jannette Carrasquillo Torres y el padrastro, Luis Vélez Calderón, para ofrecerle servicios, y la madre de la menor, negó en un principio que los golpes habían sido ocasionados por el padrastro. Cuando entrevista a la menor, ésta había indicado que su papá le había dado con la correa. Cuando entrevistó al padrastro, el Sr. Luis Vélez, éste admitió que le había ocasionado los correazos y que la trabajadora social iba a ser un plan de ayuda a la familia”. (Enfasis nuestro.) La Sm. Orellano también relató que el referido que hizo la trabajadora social de la escuela que asistía Yamillette llegó el 25 de septiembre de 2000, y se lo asignaron a ella como un caso de maltrato. La trabajadora social informó que los niños no tendrían clases del 25 al 29 de septiembre. Por lo tanto, la Sra. Orellano se movilizó a la comunidad donde vivía Yamillette.
Durante su visita, la Sra. Orellano no encontró a nadie, por lo que procedió a dejarle una notificación en la puerta a los padres de Yamillette. La Sra. Orellano entrevistó a un vecino; le preguntó si había escuchado que maltrataran a las niñas, si utilizaban palabras obscenas o hubiese escuchado golpes a lo que el vecino contestó que no. Ese mismo día, como a la 1:30 pm, Vélez Calderón contestó la notificación dejada en su puerta llamando a la Sra. Orellano. Dijo que no podía reunirse porque estaba sometiendo un caso de drogas; aún así, la Sra. Orellano lo citó para el 2 de octubre de 2000.
Vélez Calderón asistió a la reunión acompañado de Jannette. Luego de hablar de la situación de la niña, la Sra. Orellano le explicó que el procedimiento era que ella iba a visitar la comunidad y la escuela. También, que iba a ver a las niñas para coordinar y brindarle los servicios necesarios. Este plan nunca se concretizó. El 9 de octubre de 2000, la trabajadora social del Hospital Interamericano de Medicina Avanzada (HIMA) llamó a la Sra. Orellano y le informó que Yamillette fue hospitalizada porque estaba en “shock”, y que le indicó a Jannette que iba a referir la situación al Departamento de Familia. Notificada la Sra. Orellano, ésta notificó la situación a sus superiores y como resultado le dieron instrucciones de movilizarse el día siguiente al hospital. Lamentablemente, la Sra. Orellano escuchó en la radio que la niña había fallecido. Hasta aquí, el resumen de la única declaración jurada admitida en evidencia.
De otro modo, el Magistrado excluyó dos declaraciones juradas firmadas por Jannette con fecha de 17 y 19 *729 de octubre de 2000, las cuales fueron ofrecidas por el Ministerio Público. Por tanto, quedaron marcadas como evidencia ofrecida y no admitida. (Páginas 26 y 27 de la Transcripción de la vista preliminar en alzada.) A continuación, se transcribe parte de las declaraciones juradas firmadas por Jannette:

“Declaración Jurada del 17 de octubre de 2000

...Como a las 2:30, salimos del parque y Yamilette vomitó por el camino, en la parte de atrás del interior del carro. Luis le dijo a Yamilette que le iba a dar cuando llegara a casa. Llegamos a casa, como a las 3:30 de la tarde, porque Luis iba a trabajar a las 4:00 de la tarde. Nos bajamos del carro, la nena llegó hasta el baño, se quitó la ropa que estaba vomitada. Yo iba a bañarla; Luis me dijo que me recostara, que él la iba a bañar porque yo me sentía mal. Después, al rato, yo oí cuatro cantazos en la pared del baño que da hacia el cuarto donde yo estaba acostada. Yo me levanto rápido luego de escuchar los golpes en la pared, abro la puerta del baño y Yamilette estaba en el piso, juera de la bañera, mojada y estaba sin ropa, boca arriba y tenía un moretón como en el vientre, vi los pelos de la nena pegados en la pared que daba en la misma pared donde escuché los cantazos y Luis estaba sentado en el inodoro como asustado y estaba tocándole la carita y la nena estaba llamándome, me decía: “Mamá” y ahí yo le pregunté a Luis qué había pasado, porque él estuvo todo el tiempo con la nena en el. baño, que fueron como diez minutos desde que entraron, y Luis me dijo que la nena se había caído y ahí yo fui a mi cuarto de nuevo llorando con la otra nena y él coge a Yamilette y la seca y le pone ropa y la lleva al hospital...

Cada vez que Yamilette abría la nevera, Luis le daba. En una ocasión, frente a mí, le dio un correazo bien fuerte y la marcó en una pierna y la maestra me preguntó qué había pasado y yo le dije que había sido la otra nena que le dió con un juguete, pero después Luis fue y le dijo que él había perdido el control y le había dado y nos refirieron a la trabajadora social, Orellana, del Centro Gubernamental. El le dijo a la trabajadora social que él necesitaba ayuda, que no le iba a dar más ná a Yamilette. Anteriormente, cuando el Agente Coito Lara me entrevistó yo no le mencioné nada porque me sentía mal. ”

Declaración Jurada del 19 de octubre de 2000

“...quiero ampliar la declaración anteriormente prestada el día 17 de octubre de 2000, en esta Fiscalía. Después del 8 de septiembre de 2000, le levantó el brazo completo y le dio con una mano abierta por las costillas, con mucha fuerza. Otro día a principios de octubre, la tiró contra la pared de la cocina y la nena se dio en el costado y cayó en el piso sentada...

En varias ocasiones vi cuando le dio a la nena. En la ocasión que él le dio a la nena con la correa me dijo que él tenía “malos cascos, que no me metiera con él”...

Este lunes, 16 de octubre de 2000, Luis me dijo que cuando fuera a declarar yo dijera lo mismo que él me dijo a mí, que a mí no me iba a pasar nada...

Luis se pasaba dándole casi todos los días a las nenas y yo le decía a Luis que no le diera a las nenas porque no eran hijas de él y yo le decía que por algo era que él no veía a sus nenes. ” (Enfasis suplido.)
La acusación contra Jannette se presentó el 2 de mayo de 2001. Esta, por su parte, presentó una moción de desestimación al amparo de la Regla 64(p) de las de Procedimiento Criminal. En dicha moción, la Defensa resumió lo declarado por cada uno de los testigos de cargo que prestaron testimonio durante la vista preliminar en alzada. Además, la Defensa argumentó -en esencia- que: (1) la prueba del Ministerio Público no estableció la conexión de la acusada con el delito imputado; y (2) que no se estableció en ningún momento la ocurrencia de un patrón de maltrato, cooperación, conocimiento, presencia en el lugar de los hechos o anuencia de la acusada a la muerte de su hija.
*730 A continuación, algunos de los resúmenes de las declaraciones de los testigos de cargos, contenidos en la moción de desestimación al amparo de la Regla 64(p):
A) Agente Luis Meléndez Hernández. Compañero de trabajo de Vélez Calderón desde 1993, y trabaja para la División de Drogas de Caguas desde agosto de 1995. A su vez, compartió una residencia con Vélez Calderón desde octubre de 1999 hasta finales de mayo de 2000. Fue para esta fecha que Vélez Calderón le pidió a Meléndez Hernández que se marchara de la residencia porque había conocido una muchacha bien buena y se quería casar con ella. Meléndez Hernández le indicó que lo pensara bien porque llevaba poquito tiempo de conocerla. No obstante, Vélez Calderón le dijo que deseaba convivir con Jannette y sus dos hijitas. Antes de retirarse de la residencia, Meléndez Hernández tuvo la oportunidad de compartir con Jannette y sus dos hijitas cuando éstas visitaban la residencia. Y dice: ...“pude percatarme en esas ocasiones que la joven Jannette demostraba mucho carácter a las niñas especialmente a Yamillette, siempre gritándole ...deja la beba; deja eso que se lo voy a decir a Luis”. En una de las ocasiones en la cual estaban presente mis tres hijos, observé que la joven Jannette tomó por el brazo izquierdo a la niña Yamillette y la jamaqueó hacia ambos lados con su mano derecha y la castigó, no dejándola jugar con mis tres hijos porque le había pegado a la otra niña menor. En el contrainterrogatorio declaró, en síntesis, que a pesar de alegadamente ver que se jamaqueó a la niña, no hizo su función como policía ni llamó.la atención a Vélez ni a ella. Que Jannette calmaba a las nenas diciéndole que se lo diría a Luis [Vélez]. (Enfasis suplido. Páginas 2 y 3 de la “Moción Bajo la Regla 64 P de Procedimiento Criminal.”)
B) Teresita Avilés Rodríguez: Que es Cirujana Pediátrica desde 1984 de la Escuela de Medicina de la Universidad de Puerto Rico, sub-especialidad en infantes niños de hasta 16 años. Que el síndrome de maltrato pasa desapercibido, generalmente, a menos que sean pediatras con mucha experiencia. Los indicadores son: golpes leves que no van con la magnitud del trauma que presenta el niño. Cómo luce el niño en el cuidado general, historial de vacunas, historial de cómo es cuidado en términos generales. Señales en el examen físico como de quemaduras que no se pueden explicar, fracturas que no sean compatibles con lo que ocurrió. Lo más indicativo es magnitud de trauma con un historial que no es compatible con lo narrado. Historial se forma con cada visita al médico. Conoció a Yamillette González Carrasquillo. Salió 3-4 tarde y se comunicó con la Dra. Fernández. Se comunicó con HIMA le informaron que la niña está grave con el estómago distendido. Lo informó la Dra. Lugo. Que sospechó maltrato porque era un trauma y no había historial de trauma. Llegó en condición moribunda. Era larga para su edad, barriga bien distendida, bajo peso para su edad, fría. Que salió sangre vieja a borbotones, aire con olor a tejido muerto, y mezcla de sangre con material fecal cuando la abrió para operar. La niña estaba destrozada por dentro, hígado con lóbulo derecho con una laceración estrellada, fracturado en dos partes... Que el mesenterio es una capa por donde corren los vasos sanguíneos para irrigar los órganos huecos, como estómago, duodeno, intestino delgado y grueso. Está entremedio de los intestinos y separando los órganos huecos. Desgarramiento de éste es compatible con golpes contundentes. No es compatible con una caída en una bañera ni de su cama ni que la golpeara niña de dos años con un juguete. Que pidió que no la tocaran ni la sacaran de sala hasta que hablara con la policía, porque ella estaba convencida de que la niña recibió un golpe mortal, no accidental, y ella lo clasificaba por maltrato, ya que no había historial. Que la magnitud de los golpes y la destrucción de los órganos internos no la causa otra cosa que no sea un golpe severo o trauma severo y no había historial de un golpe contundente. Examen Postmorten: Ano anormalmente dilatado con secreciones, examen ginecológico, hematomas en ambas piemitas en el área tibial anterior, uno en la parte posterior del brazo por encima del codo. (Página 21 a la 23 de la “Moción Bajo la Regla 64 P de Procedimiento Criminal.”)
C) Dra. María Conte: Médico desde 1982 y Patóloga desde 1988, sub-especialidad en Patología Forense. Board 1992, desde este tiempo trabaja en Ciencias Forenses. En 1995 se graduó en derecho. Realizando 6,000 autopsias y una buena parte han sido de niños maltratados, 100 ó más. En casos de maltrato de menores se hacen pruebas adicionales; es más minuciosa porque para llegar a conclusión se requiere más evidencia. No existe una sola especialidad en maltrato, se adquiere con la experiencia. Toman en cuenta querellas anteriores, *731 récord médicos. Realizó autopsia el 10 de octubre de 2000. Cadáver llegó con una orden del fiscal...Esta estima que los golpes podrían ser de una semana hasta 10 días. Para que el intestino se pudra tiene que haber pasado 2 ó 3 días. El golpe en la cabeza es inconsecuente porque está limitado el cuero cabelludo. Que los huesos del cráneo están intactos, no tienen fractura, la pierna izquierda demuestra un área morada, el brazo derecho presenta varias áreas de contusión, en el área de la espinilla, raspazo en el codo. La laceración del área del disentenio es compatible con golpe en el área del vientre. Que pudo haber sido causado por un joven adulto. Golpes tienen que haber sido causado 2 ó 3 días antes de la muerte. Que ella menciona un golpe, pero pueden ser varios golpes no específicamente uno. Que los golpes fueron propinados con el objeto contundente. Que concluye que fue trauma abdominal porque no encontraron fracturas esqueletales. Que en el récord de HIMA no llegaron a hacer un diagnóstico sobre porqué la niña estaba en esa condición. Que murió de un trauma abdominal causado 2 ó 3 días antes. (Página 23 a la 25 de la “Moción Bajo la Regla 64 P de Procedimiento CriminaU’')
El Ministerio Público presentó moción en oposición a la solicitud de desestimación de la Defensa; sin embargo, anejó unas declaraciones juradas presentadas en la vista que no formaban parte del expediente. Repasando, la única evidencia que podía ser considerada en esta etapa era: (1) la declaración jurada de la testigo Rosa María Orellano Rosario, que fue debidamente admitida en evidencia; (2) las dos declaraciones juradas de Jannette, las cuales fueron ofrecidas, pero no admitidas en evidencia; y (3) los testimonios vertidos por los testigos de cargos durante la vista preliminar en alzada. Por tanto, la Defensa objetó las declaraciones juradas anejadas a la moción en oposición del Ministerio Público y solicitó que se eliminaran del expediente. El Tribunal declaró Con Lugar lo solicitado por la Defensa y ordenó el desglose de dichas declaraciones juradas.
Hacemos un paréntesis para señalar que, por equivocación, esas declaraciones juradas fueron anejadas a la petición de certiorari presentada por el Procurador General ante este Foro Apelativo. Como las mismas fueron eliminadas del expediente del Tribunal de Instancia, para efectos de la petición de certiorari, estas declaraciones no se han tomado en consideración. Dicho lo anterior, continuamos con los hechos del caso.
La Defensa solicitó la inhibición del Honorable Juez Luis G. Cerra Carreira, por lo que el caso de epígrafe fue asignado a otro magistrado, el Honorable Anthony Cuevas Ramos. Resuelto lo anterior, se celebró la vista para discutir la moción de desestimación bajo la Regla 64(p). Las partes estipularon el resumen de los testimonios contenidos en la moción de desestimación. Además, el Juez escuchó y consideró la regrabación del testimonio ofrecido por la acusada durante la vista preliminar en alzada celebrada el 21 de marzo de 2002.
En síntesis, el testimonio de la acusada giró en tomo a lo siguiente: que aproximadamente un año y medio atrás, o sea los días 17 y 19 de octubre de 2000, la presionaron para que firmara las declaraciones juradas. Que la realidad fue que ella firmó las declaraciones juradas pero que no las leyó. Que en el cuartel, el Fiscal Danny López la intimidaba dándole a la pared con un libro. (Páginas 11 y 12 de la Transcripción.) Que ella estaba llorando y ellos le decían lo que tenía que decir, y que mientras eso sucedía, la taquígrafa escribía. Que su compañero consensual la reprendía y le daba, pero no eran golpes que la mataran, y en cambio, la obligaron a decir que su compañero la maltrataba.
No obstante, a preguntas del Fiscal en el contrainterrogatorio, Jannette contestó que ella veía cuando en ocasiones su compañero consensual le pegaba a su hija, pero que entendía que no era para matarla. (Página 13 de la Transcripción.) Como podemos apreciar, la controversia surgida durante la vista para discutir la moción al amparo de la Regla 64(p) fue una de credibilidad en tomo a: la declaración jurada admitida en evidencia, los testimonios de los testigos de cargo y el testimonio ofrecido por la acusada durante la vista en alzada.
Apreciada la prueba, el Juez declaró Con Lugar la moción de desestimación bajo la Regla 64(p), y dictó sentencia de conformidad. Es de esta sentencia que el Procurador General acude ante este foro apelativo adjudicándole al Tribunal de Instancia la comisión del siguiente error:

*732
“SEÑALAMIENTO DE ERROR

El Tribunal de Primera Instancia erró al desestimar -por el fundamento de la Regla 64(p)~, la acusación por Asesinato en Segundo Grado presentada contra la recurrida Jannette Carrasquillo Torres por el asesinato de su hija Yamillette, cuando, lejos de haber ausencia total de prueba sobre el delito y su conexión con la imputada, la prueba en vista preliminar demostró de manera contundente la existencia de causa probable para concluir que la recurrida previo la muerte de su hija de cuatro años como consecuencia natural y probable de sus actos y omisiones, y no hizo nada por evitarlo. ”

Habiéndose presentado la “Transcripción de la Vista en Alzada” y los autos originales del caso de epígrafe, y con el beneficio de la comparecencia de la Sociedad para Asistencia Legal, en representación de la recurrida Jannette Carrasquillo Torres, nos encontramos en posición de resolver.
II. EXPOSICION Y ANALISIS
Es norma establecida que la credibilidad de los testigos no se discute durante una vista preliminar como tampoco en una vista para discutir una moción al amparo de la Regla 64 (p) de las de Procedimiento Criminal. Este tipo de vista no es un juicio, y la exoneración de un imputado basándose en la credibilidad que ofrezcan varios testigos a un Magistrado, es algo que compete a un juicio en sus méritos.
No obstante, el Tribunal Supremo ha reconocido que en aras de evitar acusaciones insustanciales, el imputado tiene derecho a demostrar en la vista preliminar que la credibilidad de los testigos de cargo es improbable. De esta manera se estableció que en vista preliminar, el magistrado puede apreciar la credibilidad de los testigos, en esas circunstancias. Pueblo v. Ortiz Vega,_D.P.R._(1999), 99 J.T.S. 154, págs. 157-158, Op. de 8 de octubre de 1999; Pueblo v. Rodríguez Aponte, 116 D.P.R. 653, 667 (1985).
Sin embargo, si analizamos las probabilidades de los hechos de este caso y de que la recurrida esté vinculada a éstos, se cumple con las exigencias del quantum de prueba requerido. En Puerto Rico, los casos de maltrato a menores dejan de ser improbables para convertirse en una alarmante realidad. Según las estadísticas del Departamento de la Familia, desde julio de 2000 hasta junio de 2001, el total de quejas recibidas en las que se indicaba que un menor era víctima de maltrato, o estaba en riesgo de serlo, ascendió a 36,890 casos. Ya sabemos que, lamentablemente, Yamillette forma parte de estas estadísticas en su modalidad de fatalidad, ya que su caso fue referido a la Sra. Orellano el 27 de septiembre de 2000. (Departamento de la Familia, Administración de Familias y Niños, Programa de Protección Social a Menores, Movimiento de Referidos.)
Ahora bien, para que un acusado prevalezca en cuanto a una moción al amparo de la Regla 64(p) de las de Procedimiento Criminal, 34 L.P.R.A. Ap. II, el acusado viene obligado a demostrar que medió una ausencia total de evidencia legalmente admisible en cuanto a alguno de los elementos del delito o en cuanto a la conexión del acusado con el delito imputado. Pueblo v. Andaluz Méndez, 143 D.P.R. 656, 662 (1997).
A nuestro juicio, el testimonio de la acusada de que hace más de un año fue presionada para que firmara ciertas declaraciones juradas, no es un testimonio de naturaleza exculpatorio que pudiere conllevar una determinación de no causa. Máxime cuando el Tribunal Supremo se ha expresado en cuanto a cuáles deben ser los criterios para evaluar declaraciones juradas versus un testimonio posterior incongruente prestado por un testigo de cargo, a los fines de determinar si son suficientes para alcanzar o cumplir con el criterio de “más allá de duda razonable”. Pueblo v. Adorno Cabrera, 133 D.P.R. 839(1993). Al evaluar el valor probatorio de este tipo de prueba debe tomarse en cuenta.que las declaraciones de un testigo hechas en fecha cercana a los hechos son generalmente más confiables que las posteriores, pues se hicieron con la memoria más fresca y existían menos oportunidades de influencias indebidas. Rolando Emmanuelli Jiménez, Prontuario de Derecho Probatorio Puertorriqueño, Editora Corripo, 1994, pág. 103.
*733 Es meritorio señalar que es un principio cardinal de derecho que este Tribunal Apelativo, en el ejercicio de su facultad revisora, tiene amplia discreción en la apreciación de la prueba pericial y documental ofrecida, encontrándonos en la misma posición que los tribunales de instancia, por lo que podemos adoptar nuestro propio criterio en la apreciación de ella. Cruz v. Centro Médico de P.R., 113 D.P.R. 719 (1983). Por lo tanto, podemos revisar la prueba admitida en el caso de epígrafe y la ofrecida, pero no admitida.
La recurrida fue acusada de asesinato en segundo grado. El Artículo 83 del Código Penal, 33 L.P.R.A 4002, establece la gradación de este delito. El asesinato en segundo grado consiste en ocasionar la muerte a un ser humano con malicia premeditada, pero sin que medie deliberación. Pueblo v. Ocasio Hernández, 139 D.P.R. 84, 90 (1995). La deliberación ha sido definida por la jurisprudencia como la resolución o decisión de matar, después de darle alguna consideración. Pueblo v. Torres Montañez, 106 D.P.R. 125, 129 (1977). Cualquier período de tiempo, por corto que sea, es suficiente para que pueda tener lugar la deliberación. La deliberación es una cuestión de hecho a ser resuelta por el juzgador. Pueblo v. Torres Montañez, supra.
Cónsono con lo anterior, el Ministerio Público estaba obligado a demostrar, durante la vista preliminar en alzada, que tiene prueba en contra de Jannette mediante la cual establece los elementos del delito imputado. Pueblo v. Rivera Rodríguez, 138 D.P.R. 138 (1995). Sin embargo, debe quedar claro que la vista preliminar no es un mini-juicio. Pueblo v. Rodríguez Aponte, 116 D.P.R. 653 (1985).
Por ende, siempre que la pmeba establezca de manera prima facie los elementos del delito, el fiscal no tiene que presentar toda su pmeba en dicha vista. Pueblo v. Rivera Alicea, 125 D.P.R. 39 (1989). El Ministerio Público no tiene que probar su caso más allá de duda razonable. Pueblo v. Figueroa Castro, 102 D.P.R. 279 (1974). En otras palabras, [l]a responsabilidad del Ministerio Público se cumple con presentar pmeba que demuestre que es probable que determinado delito ha sido cometido y que es probable que dicho delito lo cometió el imputado. Pueblo v. Ortiz Vega, supra, a la Pág. 157.
De este modo, sólo procede la desestimación bajo la Regla 64(p), 34 L.P.R.A. Ap. II, en “ausencia total” de pmeba contra el acusado. Vázquez Rosado v. Tribunal Superior, 100 D.P.R. 592 (1972). La función judicial, ante una moción bajo la Regla 64(p), no es prejuzgar la suficiencia de la pmeba para determinar la culpabilidad del imputado en esta etapa, sino que exista una ausencia total de la misma.
Por tanto, erró el foro de instancia al celebrar una vista evidenciaría para dilucidar la moción de desestimación. El foro de instancia no tenía que celebrar dicha vista, pues de la propia faz de la moción de desestimación se desprendía que no había ausencia total de pmeba. Todo lo contrario, tenemos en esa moción que: (1) la acusada sabía que su compañero consensual le pegaba a la niña, aunque para su mejor entender, no era para matarla, [Transcripción de la vista preliminar en alzada, página 13]; (2) ella misma le gritaba y ‘‘jamaqueba” a su hija, [Testimonio del Agente Luis Meléndez]; (3) La Cirajana Pediátrica, Teresita Avilés, estuvo convencida de que la niña recibió un golpe no accidental que no era compatible con la versión de que la niña se había caído en la bañera, y ella clasificaba la situación como maltrato, [Páginas 21 a la 23 de la “Moción Bajo La Regla 64 (p) de Procedimiento Criminal”.]; (4) La Patóloga María Conte estimó que los golpes pudieron ser de una semana hasta de 10 días antes de la muerte y encontró otros golpes menores en el cuerpo de la niña, [Páginas 23 a la 25 de la “Moción Bajo La Regla 64 (p) de Procedimiento Criminal".]
Ciertamente, en el caso de autos, al tomar como cierta la evidencia presentada por el Ministerio Público, el Juez de Instancia debió razonablemente entender que existe más que una scintilla de evidencia en apoyo a la acusación de asesinato en segundo grado, y que el Ministerio Público había presentado un caso prima facie contra la acusada. En todo caso, sería en el juicio que el quántum de pmeba del Ministerio Público tiene que ser mayor, y por eso, nada impide que Jannette reproduzca sus planteamientos de que no se probaron los elementos del delito imputado, más allá de duda razonable. El éxito de sus planteamientos -en esa etapa-, dependerá de la pmeba que presente el Ministerio Público. En ese sentido, el mejor mecanismo que tiene la acusada para revisar *734 una determinación de existencia de causa probable de que cometió el delito imputado lo constituye la pronta ventilación del juicio. Pueblo v. Tribunal Superior, 104 D.P.R. 454 (1975).
DICTAMEN
Por lo expuesto, se expide el auto de certiorari solicitado, se revoca la resolución recurrida y se devuelve el caso para la continuación de los procedimientos.
Así lo pronunció y manda el Tribunal y lo certifica la Secretaria General.
Aida I. Oquendo Graulau Secretaria General